**NATIONAL ADVANCED SYSTEMS,**
Plaintiff–Appellant,

v.

**The UNITED STATES, Defendant–**
Appellee.

No. 93–1496.

United States Court of Appeals,
Federal Circuit.

June 9, 1994.

---

Thomas M. Peterson, Brobeck, Phleges & Harrison, San Francisco, CA, argued for plaintiff-appellant.

Bruce N. Stratvert, Atty., Commercial Litigation Branch, Dept. of Justice, New York City, argued for defendant-appellee. With him on the brief were Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director and Joseph I. Liebman, Attorney in Charge, International Trade Field Office. Also on the brief was Stephen Berke, Office of the Asst. Chief Counsel, U.S. Customs Service, New York City, of counsel.

Before MAYER, LOURIE, and SCHALL, Circuit Judges.

LOURIE, Circuit Judge.

National Advanced Systems[1] (NAS) appeals from the judgment of the United States Court of International Trade sustaining the decision of the United States Customs Service (Customs) classifying merchandise imported by NAS under Item 676.15 of the Tariff Schedules of the United States (TSUS) (codified at 19 U.S.C. § 1202 (1982)). *National Advanced Sys. v. United States*, No. 88–01–00015, 1993 WL 235613 (Ct.Int'l Trade June 24, 1993). Because the imported merchandise is properly classified as a "computing machine" under that tariff provision, we affirm.

## BACKGROUND

NAS imports, sells, and services Hitachi computers in the United States, including the "R–9" line of mainframe computers. The R–9 computer, in its basic "uniprocessor" configuration, utilizes an instruction processor which decodes instructions and carries out arithmetic and logic operations. The computer's performance can be improved by means of a processing scheme known as "multitasking," whereby the operations normally performed by one instruction processor are shared by two instruction processors. The merchandise at issue allows for the conversion of the R–9 computer into a "multiprocessor" computer capable of implementing a multitasking scheme. Invoiced as an "Additional Instruction Processor" (AIP), the

---

1. National Advanced Systems is the predecessor of Hitachi Data Systems Corp., which is wholly owned by Hitachi Data Systems Holding Corp., a corporation organized under the laws of Delaware. Hitachi Data Systems Holding is owned by Hitachi Ltd. of Japan (80.5%) and Electronic Data Systems Corp. of Texas (19.5%).

merchandise is structurally and functionally similar to the R–9's primary instruction processor and affords increased processing capacity when installed in the R–9 computer.

The imported merchandise entered the United States on October 17, 1984 from Japan. Customs classified the merchandise under Item 676.15, TSUS, a provision covering "[a]ccounting, computing, and other data-processing machines." The merchandise was liquidated on December 12, 1986 at a rate of 4.1% *ad valorem*. On May 4, 1987, NAS filed an administrative protest challenging Customs' classification decision. NAS asserted that the merchandise was properly classifiable as "[p]arts of automatic data-processing machines" under Item 676.54, TSUS, a duty-free provision.[2] Customs, which considered the AIP "an unfinished computer," denied the protest.

On December 29, 1989, NAS filed a complaint in the United States Court of International Trade contesting the denial of its protest pursuant to 28 U.S.C. § 1581(a) (1988). NAS alleged that Customs erred in classifying the AIP under Item 676.15 because the AIP is not a computing machine, but a component which merely enhances the performance of the R–9 mainframe computer. Moreover, NAS claimed that because the AIP is incapable of functioning without being installed in the R–9 computer, it is properly classifiable as a "part" under Item 676.54.

A trial *de novo* was held during which evidence and expert testimony was submitted by both parties on the issue whether the imported merchandise was a "computer."[3]

The Court of International Trade ultimately rejected NAS's contention that the AIP was not a computing machine. Although the court acknowledged that the AIP could not perform useful work independently of the R–9 computer, it determined that "[n]onetheless, when installed in the R–9 mainframe system, the AIP computes." Slip op. at 5. In addition, the court concluded that the AIP was a "computer" for classification purposes because it contains all the basic elements of a stored-program digital computer, *i.e.*, memory, control, processing, and input/output links, "albeit in truncated form." *Id.* at 6. Accordingly, the trial court found in favor of Customs and entered judgment sustaining its classification decision. NAS now appeals.

## DISCUSSION

"The ultimate issue as to whether particular imported merchandise has been classified under an appropriate tariff provision is a question of law subject to *de novo* review. Resolution of that issue generally entails a two-step process of (1) ascertaining the proper meaning of specific terms within the tariff provision and (2) determining whether the merchandise at issue comes within the description of such terms as properly construed. The first step is a question of law which we review *de novo* and the second is a question of fact which we review for clear error. In reviewing classification determinations, Customs' classification of imported merchandise is presumed to be correct and the burden is on a party challenging the

---

2. The disputed tariff provisions are found in TSUS Schedule 6, Part 4, Subpart G (1986) ("METALS AND METAL PRODUCTS—Machinery and Mechanical Equipment) and read as follows:

Calculating machines; accounting machines, cash registers, postage-franking machines, ticket-issuing machines, and similar machines, all the foregoing incorporating a calculating mechanism:

676.15 Accounting, computing, and other data-processing machines

. . . .

Parts of the foregoing:

676.54 Parts of automatic data-processing machines and units thereof, other than parts incorporating a cathode-ray tube.

3. Both parties use the terms "computer" and "computing machine" interchangeably. We agree with the trial court that a computer is a type of computing machine. Thus, if the AIP meets the definition of a computer, it also satisfies the description "computing machine" under Item 676.15.

Respecting the other two terms of Item 676.15, the trial court concluded that the term "accounting machine" has a specific meaning and that the AIP does not fall within that term. It is not clear, however, whether the trial court, in holding that the AIP was a "computing machine," also determined that the AIP met the definition of "data-processing machine." Because the term "computing machine" is dispositive in the instant case, we need not address whether the other two tariff terms apply.

classification to overcome that presumption." *Marcel Watch Co. v. United States,* 11 F.3d 1054, 1056 (Fed.Cir.1993) (citations omitted).

 NAS argues that the term "computing" generally refers to the ability to receive, execute, and complete computational problems. *A fortiori,* NAS asserts that a "computing machine" under Item 676.15 must have the self-standing ability to receive data directly from the user, to undertake assigned tasks, and to communicate results directly to the user. NAS argues that because an AIP is incapable of performing those functions on a stand-alone basis, it cannot be a "computing machine" covered by Item 676.15. That argument, however, does not compute.

The AIP is a large machine which contains an instruction unit, a general arithmetic unit, a floating-point arithmetic unit, and a buffer control unit. As with other components dedicated for use in an R–9 computer, the AIP cannot operate by itself but must be used in conjunction with the other main components of the computer.[4] For example, a person using an R–9 computer typically inputs a command via a main console consisting of a cathode ray tube display and a keyboard. When the entered command is received by the AIP, it is decoded and the necessary arithmetic and logical operations required to carry out the command are performed. During this process, the activity of the AIP is coordinated with the computer's main memory and the input/output processors by the computer's service processor. Thus, when operating as designed, the AIP functions similarly to that of the computer's primary instruction processor: the AIP receives, processes, and executes commands from the user. In other words, it computes.

That the AIP cannot compute without the other components comprising the R–9 computer system does not alter the critical fact that "once installed [the AIP] does computing." Slip op. at 7. The inability of the AIP to perform computations independent of the R–9 computer does not itself preclude the AIP from being classified as a "computing machine" under Item 676.15. Indeed, witnesses from both parties acknowledged that the R–9 computer's service processor, another "imbedded" device, qualifies as a computer under Item 676.15 notwithstanding that like the AIP, the service processor cannot perform useful work without other components.

NAS's contention that a device must possess stand-alone capability to compute in order to be classified as a computing machine finds no support in the statute. Neither Item 676.15 nor its superior heading imposes any requirement that an article must possess an "inherent" or "self-standing" ability to compute in order to be classifiable therein.[5] Nor does the statute make any distinction between "stand-alone" computers and "imbedded" computers. We reject NAS's attempts to engraft a limitation onto the tariff provision not clearly intended by Congress. The controlling question for classification purposes under Item 676.15 is whether the machine at issue "computes," irrespective of whether it does so by itself or in connection with another machine.

In *Fairchild Camera & Instrument Corp. v. United States,* 53 CCPA 122, 1966 WL 8923 (1966), our predecessor court rejected a similar argument that an article must have stand-alone capability in order to be classified under an *eo nomine* provision that describes it. The imported article in *Fairchild* was a photofluorographic device capable of making photographic records of mass chest X-ray surveys. The device was specially designed for use in connection with an X-ray apparatus and was not capable of general picture taking.[6] *Id.* at 125. Despite the

---

**4.** The main components of a basic R–9 system include an input/output processor, a service processor, an instruction processor, a storage control unit, and main storage (memory).

**5.** Item 676.15 is subject to the limitation of its superior heading requiring that the machine incorporate a "calculating mechanism." That general limitation is not in dispute in this appeal.

*Cf. Burroughs Corp. v. United States,* 845 F.2d 321 (Fed.Cir.1988).

**6.** The device in *Fairchild* was found to be "basically the same" as the imported article at issue in *Westinghouse Electric International Company v. United States,* 28 Cust.Ct. 209, C.D. 1411 (1952). In *Westinghouse,* the U.S. Customs Court found that the imported article could "function as a camera only in connection with and as part of a

article's inability to take photographs independently of the apparatus, the court held that the article was properly classified as a "photographic camera," not as a "part" of an X-ray apparatus, because it functioned as a camera once it was affixed to the apparatus.

Accordingly, we hold that the trial court did not err in concluding that the term "computing machine" in Item 676.15 does not require stand-alone capability to compute. Because the AIP does compute when installed in the R–9 computer, it falls within the scope of that tariff provision.

■ Alternatively, NAS contends that term "computing machine" covers only those machines equivalent to a stored-programmed digital computer having the ability to store and retrieve data for future use and to communicate directly with the user. In support of that restrictive interpretation, NAS relies on the historical, trade, and scientific usage of the term "computer." NAS claims that the weight of such evidence indicates that a machine must possess permanently stored memory and direct input/output capability in order to be considered a computer for purposes of Item 676.15.

Specifically, NAS alleges that at the time the TSUS was adopted,[7] the term "computer" referred invariably to the "von Neumann" computer model. Under the definition proposed by Professor John von Neumann in the mid–1940's, a computer must contain four core "organs": a memory organ, an arithmetic organ, a control organ, and an input/output ("I/O") organ. NAS contends that in enacting Item 676.15, Congress contemplated only von Neumann-type computers because that definition prevailed at the time of enactment. Because the AIP allegedly lacks requisite memory and I/O organs, NAS asserts that the trial court erred in concluding that the AIP is a computer as defined by von Neumann.

At the outset, we note that in determining that the AIP possesses all of the essential elements of a von Neumann computer, the

trial court did not conclude that the term "computing machine" in Item 676.15 is limited to that particular type of computer. Neither the statute nor the extrinsic evidence produced at trial indicates that Congress intended to limit the scope of the statutory term to von Neumann-type computers. The issue for purposes of classification under Item 676.15 is whether the AIP is a "computing machine," not whether it meets the definition of a von Neumann computer.

Item 676.15 "is an *eo nomine* designation which includes all forms of the article." *Hasbro Indus., Inc. v. United States,* 7 Fed. Cir. (T) 110, 112, 879 F.2d 838, 840 (1989). The express language of Item 676.15 broadly covers "computing machines" and contains no terms of limitation confining its scope to machines having a specific kind of memory or input/output capability. *See Burroughs Corp. v. United States,* 11 CIT 291, 297, 664 F.Supp. 507, 513 (1987) (types of machines covered by item 676.15 are not limited to those having particular memory capacity, storage capability, and a reliance on software), *aff'd* 845 F.2d 321 (Fed.Cir.), *cert. denied,* 488 U.S. 854, 109 S.Ct. 140, 102 L.Ed.2d 113 (1988). Moreover, the pertinent legislative history is devoid of any indication that Congress intended to limit the provision's scope to a certain kind of computer. *See* U.S. Tariff Comm'n, *Tariff Classification Study: Explanatory and Background Materials—Schedule 6* at 274 (November 15, 1960); Proclamation No. 4707, 44 Fed.Reg. 72,348 (1979) and 3 C.F.R. 87 (1980).

At trial, testimony from experts of both parties established that a von Neumann computer was only one particular type of computer recognized by the industry at the time the TSUS was enacted. Evidence from various authoritative lexicographic sources additionally confirms the breadth of the term "computer" as used in industry and commerce. Although the definitions vary somewhat from source to source, they all concur that at the most fundamental level, a device

---

specially constructed X-ray unit." *Id.* at 211. For purposes of classification, however, the court concluded that the article "nevertheless, in its final use, is a camera which takes and produces a photograph." *Id.* at 214.

7. The TSUS was enacted in 1962 under the Tariff Classification Act of 1962, Pub.L. 87–456, 76 Stat. 72.

is a computer if it is capable of carrying out calculations. None, however, restrict the definition of "computer" exclusively to a device having permanent memory and direct I/O capability.

We agree with the trial court that the term "computing machine," as properly construed, encompasses devices capable of computing, *i.e.*, receiving, executing and completing instructions involving calculations, and that it is not limited to devices equivalent to a stored-program digital computer. NAS has not established that the trial court's determination that the AIP is classifiable under Item 676.15 as a "computing machine" is clearly erroneous.

■ That, however, does not end our inquiry here in view of the possibility that "the importer's alternative [classification] may ... be a *better* classification than the government's." *Jarvis Clark Co. v. United States,* 2 Fed.Cir. (T) 70, 75, 733 F.2d 873, 878 (1984). Because "the court's duty is to find the *correct* result, by whatever procedure is best suited to the case at hand," *id.,* we now consider NAS's alternative classification.

NAS argues that because the AIP is a mere component of the R–9 computer, it is properly classified under Item 676.54, a provision covering "parts of automatic data-processing machines." NAS asserts that this result is mandated by General Interpretative Rule 10(c), TSUS, which directs that "an imported article which is described in two or more provisions of the schedules is classifiable in the provision which most specifically describes it." Under this so-called "rule of relative specificity," NAS insists that Item 676.54 prevails over Item 676.15 because the AIP is a "part" and is thus most specifically described by Item 676.54, as opposed to Item 676.15, which NAS claims is a general "basket" provision.

Contrary to NAS's assertions, Item 676.15 is not an indefinite residual or basket provision. Rather, as discussed *supra,* Item 676.15 is an *eo nomine* provision that specifically describes the imported merchandise by name. Although it is unclear under General Rule 10(c) which provision, the *eo nomine* provision or the "parts" provision, *most* specifically describes the AIP, General Interpre-

tative Rule 10(ij) provides the answer. That rule instructs that "a provision for 'parts' of an article [Item 676.54] covers a product solely or chiefly used as part of such article, *but does not prevail over a specific provision for such part* [Item 676.15]" (emphasis added). As the trial court correctly recognized, that rule precludes classification of the AIP as a "part" under Item 676.54.

### CONCLUSION

The Court of International Trade correctly concluded that the AIP was properly classified as a "computing machine" under Item 676.15. Accordingly, we affirm the trial court's judgment sustaining Customs' classification decision.

***AFFIRMED.***