**NIDEC CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Slip Op. 94–138.**
**Court No. 91–07–00507.**

United States Court of
International Trade.

Sept. 1, 1994.

Barnes, Richardson & Colburn, James S. O'Kelly and Frederic D. Van Arnam, Jr., New York City, for plaintiff.

Frank W. Hunger, Asst. Atty. Gen., Joseph I. Liebman, Attorney-in-Charge, Intern. Trade Field Office, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Barbara M. Epstein, Office of Asst. Chief Counsel, Intern. Trade Litigation, U.S. Customs Service, Washington, DC (Mark Nackman, of counsel), for defendant.

### OPINION & ORDER

AQUILINO, Judge:

In this action, which has been designated a test case pursuant to CIT Rule 84(b), the plaintiff contests classification of its merchandise by the U.S. Customs Service under subheading 8501.10.40 of the Harmonized Tariff Schedule of the United States ("Electric motors ...: Motors of an output not exceeding 37.5 W: Of under 18.65 W: ... Other") while the defendant opines that this

is "the first 'motor' case to be adjudicated ... under the HTSUS," and "the scope of the 'electric motor' heading ... and the question of whether a precision 'spindle motor' is within the scope of the HTSUS heading[ ] appear to be issues of first impression." Defendant's Post–Trial Memorandum of Law, pp. 2–3.

## I

Plaintiff's complaint characterizes the goods as "computer spindles for rigid disk drives" allegedly contained in six entries listed on the summons [1] and maintains that they should be classified under HTSUS subheading 8473.30.40 ("Parts and accessories ... suitable for use solely or principally with machines of headings 8469 to 8472: ... Parts and accessories of the machines of heading 8471: Not incorporating a cathode ray tube"). HTSUS heading 8471 encompasses "Automatic data processing machines and units thereof". Other references to the merchandise in this action include "brushless DC motor", "disk drive precision spindle", "disk memory spindle", "motorized computer spindle", "spindle assembly" and "spindle motor". Whatever the nomenclature, there are three elements, namely, a shaft centering a precision spindle, a stator and a rotor, imported either separately or loosely connected. *See* trial transcript ("Tr."), pp. 41, 45–46, 60; Plaintiff's Exhibits 5 and 6. They were custom-designed for assembly in computer hard-disc drives of the Hewlett–Pack-

ard Company called Coyote I or Coyote II and manufactured by that firm until the stator and the rotor were "outsourced" to the plaintiff, as was the spindle "when Nidec's capabilities matched [H–P's] requirements". Tr. at 25. *See also* Pretrial Order, Schedule C, para. 3.

At trial, Steven M. Johnson of Hewlett–Packard described a computer hard-disc drive as a

> magnetic storage device. . . . in the form of rigid, aluminum platters [the media] which are coated with a magnetic material[,] ... have a ... read/write head, and by sending current through that head which contains an electromagnet, we can magnetize very small domains in that magnetic media. Then, as we rotate the disk ... and ... pass over those magnetic domains they will cause a current in the read/write head which we can then decode and that's how we read and write information in a hard disk drive.

Tr. at 8–9. The Coyote drives have individual discs stacked about a spindle. The Coyote II spindle mounts eight discs and rotates at approximately 4,000 rpm, while the Coyote I was designed to accommodate six discs and speeds of 3,300 rpm. *See id.* at 36. A Hewlett–Packard patent [2] on electrical isolation of the disc stack for the Coyote II depicts various components, including those at issue herein, in the following manner, among others:

---

1. Subsequent pretrial preparations led the parties to conclude that two of the six entries, Nos. 0440527–6 and 0440535–9, did "not contain merchandise which is at issue ... and thus should be severed and dismissed from this action." Pretrial Order, Schedule B.

2. Plaintiff's Exhibit 13.

## FIG.6

Those at bar (and illustrated schematically *supra* as on sheet 3 of the patent dated March 12, 1991) are numbered 19, the spindle; 25, the drive shaft; 27a, the stator; and 27b, the rotor. The patent states:

> The spindle 19 comprises an upper cylindrical support, about which an inner barrel of the disk stack is journalled by bearings. The disks 1a of the disk stack are clamped between annular spacers in a stack between a lower flange of the barrel 21 and a circular clamping plate at the top of the barrel 21. A disk stack drive shaft 25 is journalled by bearings in the spindle 19 and engages and is secured to the disk stack at the clamping plate to rotate the disk stack.[3]

Furthermore:

> The disk stack is rotated by a motor 27, having a stator 27a secured to the bottom end of the spindle 19 and a rotor 27b secured to the bottom end of the disk stack drive shaft 25. Screws, which thread into the spindle 19 through its bottom face secure the motor stator [2]7a to the bottom

face of the spindle 19 and also secure connectors on the ends of conductors and to the stator 27a, to provide electrical connections thereto. These electrical connections extend from the stator 27a to the spindle 19 to the bearings to the inner barrel 21 of the disk stack and to the disk stack, including the individual disks 1a. A plug receptacle is secured in a cavity in the bottom face of the base of the mainframe. The conductor 29 is connected to a terminal in that plug to be supplied with a DC bias voltage, the same as that coupled to the magnetic heads 3a at each disk 1a. . . . The other conductor is grounded through a capacitor to provide an AC ground, but which is an open circuit to the DC bias voltage. Thus the DC bias voltage is conducted from the plug, via conductor 29 to the stator 27a, to the spindle 19, to the bearings 23, to the inner barrel 21, and from there to the individual disks 1a.[4]

*See also* Tr. at 25–38.

---

3. *Id.,* col. 4, lines 27–35 (reference numbers not set forth on Fig. 6, *supra,* deleted from this quotation).

4. *Id.,* col. 5, lines 25–48 (reference numbers not set forth on Fig. 6, *supra,* deleted from this quotation).

In addition to this disc assembly, which "contains basically the mechanical portion"—the read-write heads, the discs, the spindle and the actuator, the "other main assembly", according to the plaintiff, is the printed circuit assembly, which, among other things, contains the drive and commutation electronics for the motor. *See id.* at 9, 16.

Each read/write head rides over a disc on a cushion of air, separated from it at a distance of 10– to 20–millionths of an inch, while the disc rotates at speeds of up to 4,000 times per minute. *See id.* at 11, 12, 17–18. Stability, positioning and speed are crucial to precise operation. *See id.* at 21–23. *See also id.* at 17 (rotation must be exact "both in terms of speed and angle versus time" to permit the heads to read data stored on the discs). Hence, a discdrive has to have an axis of rotation that

> doesn't translate or go up and down or side to side, or wobble at all. So, we have to specify that axis ... and define it, and produce that theoretical line. And the device we use to do that is called the spindle.

*Id.* at 18. The spindle "fixes certain degrees of freedom and doesn't allow certain motions through." *Id.* at 83. Its precision rotation minimizes non-repeatable runout, which was described as follows:

> If we imagine writing a circumferential track on the disk, all spindles have some runout. And what that is ... if we look at a surface of the hub and we rotate the hub ... and look at radial displacements, those radial displacements would be called runout of a spindle....
>
> Non-repeatable runout would be runout that doesn't repeat. It's different on this revolution and that revolution.... [I]t's particularly disastrous because you can write data with your non-repeatable runout going left, for instance, and then you have to be able to read with it going right. So, those errors in a spindle are doubled by the process of writing and then trying to read the same data.

*Id.* at 23–24. *See also id.* at 205, 205–06 ("The effect of non-repeatable runout is that it is an element ... of the misregistration of the read/write head relative to the track that it's trying to read." It is "a shift in the position of the track that is being followed.") In sum, and the court so finds, precision of the spindle is crucial to effective storage and retrieval of data.

As shown above, the spindle's remarkable, precise rotation is engendered by the interaction of the rotor and the stator upon electrification. The rotors at issue are permanent magnets bonded into steel stamped rotor cups and surrounded by plastic rings bearing curved blades, which fan to equalize temperatures within the drive. The stators are possessed of electromagnetic poles, a colored circuit disk which contains "hall cells", and lead wires for connection to the drive circuitry. As explained by the plaintiff, "electrical current energizes the wound laminates, which then react with the magnetic poles of the rotor." Plaintiff's Pretrial Brief, p. 13. The hall cells "sense the position of the rotor's magnet, and relay this positional information to the drive electronics found on the disk drive's [printed circuit assembly]." *Id.* The circuitry interprets "the relative position of [the] magnet in the rotor and the stator poles, and then ... choose[s] which is the optimum phase to apply direct current". Tr. at 53. A steel plate attached to the circuit board protects the reading and writing sensors from electrical interference caused by motor commutation. *See id.* at 33.

The spindles, rotors and stators are assembled into the discdrives in specially-filtered environments known as "clean rooms":

> The first thing we do is take a spindle and bond that with our insulator portion ... into the base casting.... [T]hen we would put the breather filter on. Then [a robot] ... assemble[s] a stack of media ... inside the base casting.... And it puts the clamp down, drives the screws, and then we put in what we call the magnetic flux assembly. It's another set of permanent magnets in a return path which is part of th[e] actuator.

*Id.* at 27–28, 41–42. At this point, the assembly is flipped over and the stator is attached

to the spindle's shaft on the opposite side of the base casting. The stator's ground line is then secured to the casting's underside. *See id.* at 42. Two screws are "driven through the stator into the spindle." *Id.* The rotor is attached to the spindle's shaft and secured with a lock washer and nut. *See id.* The next step is installation of the head arm assembly. After the base casting is covered, vibration isolators are placed, and the stator connector and the read/write flex circuit are attached. *See id.* at 43. To complete the discdrive, the printed circuit assembly is bolted to the head drive assembly. *See id.*

## II

After the foregoing facts had been well-presented and elucidated on both sides[5] at trial, opinions were handed down in *Sumitomo Corp. of America v. United States,* 18 CIT ——, 855 F.Supp. 1283 (1994), and *Nat'l Advanced Systems v. United States,* 26 F.3d 1107 (Fed.Cir.1994), *aff'g* 17 CIT ——, Slip Op. 93–119, 1993 WL 235613 (June 24, 1993), shedding further light on the subject area. At issue in *Sumitomo* was classification, under the Tariff Schedules of the United States ("TSUS"), of voice coil positioning devices for computer hard-disc drives. The court found

> VCPDS are one type of actuator used in the read/write head positioning system. "VCPDs are linear or rotary actuators that are driven by voice coil motors ... in conjunction with servo systems which sense position information from the disks." The voice coil motor within the VCPD "consists of a frame in which sit a copper covered core, magnets on either side, and a wire-wound coil and arm attached to a fixed fulcrum." The copper core and magnets create a magnetic field around the core in which lies the coil. Varying the electricity supplied to the coil exerts force on the coil, causing it to move back and forth. The coil's motion, in turn, causes the VCPD's arm to pivot on the fulcrum, thereby setting in motion a carriage arm to which the read/write heads are attached.

The motion of the carriage arm thus prompts the read/write heads to interact with the magnetic memory media used in the computer.

18 CIT at ——, 855 F.Supp. at 1284 (citations omitted). Customs classified those devices under TSUS item 682.25 as motors, while the plaintiff claimed classification, like the matter at bar, as parts of automatic data processing machines and units thereof, albeit per TSUS item 676.54.55, arguing, among other things, that the

> judicially-determined meaning of the term "motors" under the TSUS[ ] ... only applies to those devices which transform electrical energy into mechanical energy through the use of a *rotating* shaft. According to plaintiff, a VCPD "is not a rotating device [and] does not produce rotating shaft power" and, therefore, does not satisfy the definition of the term "motor" as used in the TSUS. Instead, ... the VCPD is a linear motor that produces a back and forth motion. While plaintiff acknowledges the VCPDs produce a very small rotation in the pivot arm of less than 20° of an arc, ... the actual motion of the coil is linear and thus precludes the merchandise from being a "motor" under the TSUS.
>
> Finally, plaintiff contends the "more than" doctrine.... precludes Customs from classifying an article under an *eo nomine* provision for the article if the article is "more than" the items described by the provision.... [T]he VCPD has various additional features that are not integrated with the merchandise's linear motor and that harness the motor's power for a specialized purpose.... [P]laintiff emphasizes the VCPDs are "essential components in hard magnetic disk drives" and have no other function apart from their operation as positioning devices in the disk drives.

*Id.* at ——, ——, 855 F.Supp. at 1286 (emphasis in original, citations and footnote omitted). The court concluded that, although the

---

5. The quality of the parties' presentations has obviated any need to grant defendant's motion for leave to file a reply brief now.

subject devices contained the essential elements of an electric motor, "additional components, the VCPD frame, arm, and pivoted bearing in the fulcrum"[6] made the merchandise "more than" an electric motor for tariff purposes. *Id.* at ——, 855 F.Supp. at 1289.

*Nat'l Advanced Systems* likewise involved a component for a computer. In that case, the plaintiff prayed for classification of its additional instruction processor or "AIP" also as part of an automatic data processing machine, specifically under item 676.54, TSUS. The trial court, however, affirmed the Service's classification of the AIP as such a machine itself, under TSUS item 676.15, according to the following reasoning:

> ... The AIP clearly has a calculating mechanism and is a machine. It does not matter that it needs to be installed with other R–9 computer components to be useful. The AIP does not compute until it is installed, but once installed it does computing in the R–9 mainframe computer. The logical and common meaning of computing machine is a machine which computes. Accordingly, the AIP satisfies the very broad language of item 676.15. ...

17 CIT at ——, Slip Op. 93–119, at 7 (citations omitted). On appeal, the Federal Circuit concurred, reaffirming an earlier opinion that an article need not have stand-alone capability in order to be classified under an *eo nomine* provision that describes it. 26 F.3d at 1110–11.

### III

Computers seem to stand now everywhere, but this omnipresence has not spawned widespread comprehension of their technical complexities. On the other hand, the rules of law governing this court's review of the component(s) at issue herein are not complex. First and foremost, the statute subjecting

the sovereign to this review provides that the decision of Customs "is presumed to be correct" and the "burden of proving otherwise shall rest upon the party challenging such decision." 28 U.S.C. § 2639(a)(1).

Necessarily, these rules guided the courts in deciding *Sumitomo* and *Nat'l Advanced Systems*. In the latter case, the court of appeals reaffirmed its corollary thereto, namely, that this "court's duty is to find the *correct* result, by whatever procedure is best suited to the case at hand." *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878, *reh'g denied*, 739 F.2d 628 (Fed.Cir.1984) (emphasis in original, footnote omitted). *See also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803); *Semperit Indus. Products, Inc. v. United States*, 18 CIT ——, ——, 855 F.Supp. 1292, 1299 (1994). As indicated, those cases were decided under the TSUS, which has been supplanted by the HTSUS in this action.

■■■ Although the defendant does concede that the merchandise at bar is intended for use in the Hewlett–Packard discdrives[7], it argues that classification under the subheading for computer parts and accessories is precluded by operation of Note 2(a) to Section XVI of the HTSUS. The plaintiff, on the other hand, relies on Note 2(b) thereto. Those sections provide that parts of the machines are to be classified according to the following rules:

> (a) Parts which are goods included in any of the headings of chapters 84 and 85 ... are in all cases to be classified in their respective headings;
>
> (b) Other parts, if suitable for use solely or principally with a particular kind of machine, or with a number of machines of the same heading ... are to be classified with the machines of that kind. ...

The Explanatory Notes hereon[8] state (at page 1131) that "parts which are suitable for use solely or principally with particular ma-

---

**6.** *Sumitomo Corp. of America v. United States,* 18 CIT ——, ——, 855 F.Supp. 1283, 1289 (1994).

**7.** *See, e.g.,* Defendant's Pre–Trial Memorandum of Law, p. 2; Pretrial Order, Schedule C, para. 3; Tr. at 3–4.

**8.** Such notes are considered instructive, not dispositive. *See, e.g., Lynteq, Inc. v. United States,* 976 F.2d 693, 699 (Fed.Cir.1992); *Guidance for Interpretation of Harmonized System,* T.D. 89–80, 23 Cust.Bull. 379, 381 (1989).

chines or apparatus ... are classified in the same heading as those machines or apparatus". This statement, however, does *"not* apply to parts which in themselves constitute an article covered by a heading of this Section ...; these are in all cases classified in their own appropriate heading even if specifically designed to work as part of a specific machine." *Id.* (emphasis in original). The Explanatory Notes also provide that it "applies in particular to ... [e]lectric motors". *Id.*

Rule 1 of the General Rules of Interpretation mandates that "classification shall be determined according to the terms of the headings and any relative section or chapter notes and, provided such headings or notes do not otherwise require, according to the [remaining General Rules]." Thus, if the goods are electric motors, even though designed specifically for use in computers, this Rule 1 and Note 2 above require the classification for which Customs opted.

■ As indicated above, the Service concluded that the goods, when assembled, do constitute a rotating electric motor, which its experts defined as a device to transform electrical energy into mechanical energy *viz.*:

> ... [A] stator ... [i]s the static part of the machine.... [A] rotor ... [i]s that part which can rotate. They are coupled magnetically. There is a shaft.... [which] maintains the clearance—the air gap between the rotor and the stator. The shaft usually is mounted on some kind of bearing[ ] so it can rotate smoothly. And then would be coupled to the mechanical load for the transmission of mechanical power or ... energy....

Tr. at 450. *See also id.* at 386. The plaintiff has stipulated to the above-stated essence of an electric motor. Pretrial Order, Schedule C, para. 8 (an "electric motor" is "a device for transforming electric energy into mechanical power, and includes rotary motors"). The Explanatory Notes for HTSUS heading 8501 contain a similar definition. They also explain that:

> ... *Rotary motors* produce mechanical power in the form of a rotary motion. They are of many types and sizes according to whether they operate on DC or AC,

and according to the use or purpose for which they are designed. The motor housing may be adapted to the circumstances in which the motor will operate (e.g., dust proof, drip proof or flame proof motors; non-rigid mountings for belt driven motors, or for motors which will be subject to much vibration).

> Many motors may incorporate a fan or other device for keeping the motor cool during running.

> With the *exception* of starter motors for internal combustion engines ... the heading covers electric motors of all types from low power motors for use in instruments, clocks, time switches, sewing machines, toys, etc., up to large powerful motors for rolling mills, etc.

> Motors remain classified here even when they are equipped with pulleys, with gears or gear boxes, or with a flexible shaft for operating hand tools.

> The heading includes "outboard motors", for the propulsion of boats, in the form of a unit comprising an electric motor, shaft, propeller and a rudder.

> Synchronous motors for clock movements are classified here even if equipped with gears; however such synchronous motors also associated with a clock train are *excluded*....

*Id.* at 1333–34 (emphasis in original).

The defendant adheres to the position that this explanation is "sufficiently broad to encompass motors of many types," including "motors which are designed to be used in specific machines". Defendant's Post–Trial Memorandum of Law, p. 2. It argues that the spindle can be equated with a pulley, gear, or flexible shaft in that it transmits the mechanical energy created by the rotor and the stator to the merchandise's intended load—the discs. The court concurs.

Although the plaintiff summarizes the spindles'

> other critical functions in the disk drive, specifically that of providing an extremely precise and consistently accurate axis of rotation for the disks, and an extremely precise and consistently accurate mounting

structure for the disks, free of outside contaminants and able to react to thermal changes in the disk drive[9,]

and argues that these functions make its goods something more than electric motors, their essence is still that of a motor, not of a spindle, the connector to the discs. Thus, unlike the goods held to be more than a motor under the TSUS in *Sumitomo,* those at bar cannot be classified under the HTSUS as more than that which drives the hard discs in a computer. Nor does plaintiff's promotional material attempt to do otherwise. To quote, for example, from its sales brochure introduced at trial as defendant's exhibit D:

> Since its founding in July 1973, Nidec has grown to become a world leader in the design and manufacturing of state-of-the-art precision brushless DC electric motors.
>
> \*  \*  \*  \*  \*  \*
>
> **Spindle Motors (Brushless DC)**
>
> Spindle motors are designed and manufactured for all sizes of Winchester disc drives: 14″, 9″, 8″, 5.25″, 3.5″ and smaller, as well as for all optical disc drives. The details of each specific application are closely reviewed with the customer to arrive at a spindle motor design which yields the desired performance and lends itself to volume production in our automated facilities.

■ While the "more than" doctrine may have survived adoption of the HTSUS[10], a broad *eo nomine* provision like that at bar still includes all forms of an article. *See, e.g., Nootka Packing Co. v. United States,* 22 CCPA 464, 470, T.D. 47464, 1935 WL 2283 (1935); *Nat'l Advanced Systems v. United States,* 26 F.3d at 1111. On the other hand, of course, this is not to hold that all machines which contain electric motors are classifiable as such[11], only that the motors presented are included in a heading of HTSUS Chapter 85 within the meaning of Note 2(a) to its Section XVI.

.

## IV

Having reached this conclusion, the court takes note of the fact, brought to its attention at trial, that the parties' preparations therefor apparently led to the realization that, although the entry papers contain references to "DC1W", the motors' actual wattage is not only in excess of one but likely the 18.65 maximum for classification under HTSUS subheading 8501.10.40. At trial, the plaintiff sought to excuse those references upon the ground that wattage had not been an issue because the goods had been imported as computer parts. *See, e.g.,* Tr. at 305–06, 328–33. Be that as it may, if the parties are able to settle the question of the exact wattage of the motors in lieu of either further administrative or judicial proceedings, they are to agree upon a proposed final judgment, including severance of entry Nos. 0440527–6 and 0440535–9 and specification of the correct subheading of HTSUS Chapter 85, and present the same to the court on or before September 30, 1994.

So ordered.

---

**9.** Plaintiff's Response to Defendant's Post–Trial Memorandum, p. 20.

At trial, plaintiff's witnesses embraced a textbook definition of a brushless DC motor as including "the drive circuitry which is required for each of the stator phases", and counsel therefore also now argue that the merchandise, imported as it was without this circuitry, is "less than" such a motor. That circuitry, however, transforms the electricity needed, not the nature of the consumer thereof. Stated another way, the circuitry is merely a conduit of that source of power, along with the plug and the lead wires. *Cf. Nat'l Advanced Systems v. United States,* 26 F.3d 1107, 1110–11 (Fed.Cir.1994).

**10.** *See, e.g.,* Sturm, Customs Law & Administration § 53.2, at 9 (3d ed. 1993); *Nestle Refrigerated Food Co. v. United States,* 18 CIT ——, ——, 1994 WL 405009, Slip Op. 94–118, at 6 (July 20, 1994).

**11.** *Cf. United States v. The A.W. Fenton Co.,* 49 CCPA 45, C.A.D. 794, 1962 WL 9340 (1962).