**INTEL SINGAPORE, LTD., Plaintiff,**

v.

**UNITED STATES, Defendant.**

Slip Op. No. 95–83.
Court No. 90–12–00624.

United States Court of
International Trade.

May 4, 1995.

Rode & Qualey, New York City (John S. Rode and Eleanore Kelly–Kobayashi), for plaintiff.

Frank W. Hunger, Asst. Atty. Gen., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice (John J. Mahon), Stephen Berke, Office of Asst. Chief Counsel, U.S. Customs Service, Washington, DC, of counsel, for defendant.

## MEMORANDUM OPINION AND ORDER

DiCARLO, Chief Judge:

Plaintiff, Intel Singapore, Ltd. (Intel) seeks to overturn the U.S. Customs Service's classification of certain imported merchandise. Customs classified the merchandise under Item 676.15, Part 4, Schedule 6, of the Tariff Schedules of the United States (TSUS) (1987), as "[a]ccounting, computing, and other data-processing machines."[1] Intel claims the merchandise is properly classifiable under Item 676.54, Part 4, Schedule 6, TSUS (1987), as "[p]arts of automatic data-processing machines and units thereof, other than parts incorporating a cathode ray tube."[2]

1.

SCHEDULE 6.  -  METALS AND METAL PRODUCTS

Part 4.  -  Machinery and Mechanical Equipment

. . .

Calculating machines; accounting machines, cash registers, postage-franking machines, ticket-issuing machines, and similar machines, all the foregoing incorporating a calculating mechanism:

676.15  Accounting, computing, and other data-processing machines. . . . . . 3.9% ad val.

2.

SCHEDULE 6.  -  METALS AND METAL PRODUCTS

Part 4.  -  Machinery and Mechanical Equipment

. . .

Office machines not specially provided for (con.): . . . .

676.54  Parts of automatic data-processing machines and units thereof, other than parts incorporating a cathode ray tube . . . . . . . . . . Free.

The court has jurisdiction pursuant to 28 U.S.C. § 1581(a) (1988). The court finds the Boards possess the capability to perform the functions necessary for their classification as a computing machine and affirms Customs' classification of the merchandise under Item 676.15, TSUS.

## BACKGROUND

In 1988, Intel imported eleven models of populated printed circuit board products from Singapore into the United States. There are three types of Boards at issue: (1) central processing unit boards (CPU Boards); (2) local area network interface boards (LAN Boards); and (3) accelerator boards (Inboards) (collectively "Board(s)"). Each Board consists of a single printed circuit board populated with electronic components. (Pretrial Order, Schedule C, Uncontested Facts, ¶ 7.) A marketable "computing unit," to be of optimal use to the consumer, contains a number of Boards, in addition to other components such as a monitor, a keyboard, a hard drive, a disk drive, a chassis, a power supply, a cooling system, cables, connectors, and fasteners. (R. at 17–29.) Additional memory and software is routinely installed as part of a computer setup. (R. at 108.)

The three types of Boards at issue perform separate functions. The CPU Boards direct execution of commands pursuant to fixed programs, installed after sale, which interpret, translate, and manipulate data. (Def.'s Ex. W, IEEE Standard Dictionary of Electrical and Electronics Terms, at 93); (see also Pl.'s Ex. 4, OEM Boards and Systems Handbook, at 3–54—3–62) (noting capabilities of iSBC 86/35 CPU board.) The LAN Boards facilitate communication between two or more personal computers by setting standards that describe how nodes are connected and what protocol should be followed in transferring data between otherwise incompatible personal computers. (R. at 67–69); Van Nostrand's Scientific Encyclopedia 1728 (7th ed. 1989); (see also Pl.'s Ex. 3, OEM Systems Handbook, at 8–12—8–23 (noting

capabilities of iSBC 186/51 LAN Board.) This permits multiple personal computers to share resources such as printers and mass storage devices. See id. Inboards are accelerator boards that supplement the existing personal computer architecture. (R. at 76.) They replace the original microprocessors in a personal computer, performing functions similar to those performed by the CPU Boards, and improve the computer's memory and computational speed. Id. All Boards contain a processor, (R. at 192), which governs the interpretation and execution of instructions pertinent to the Boards' function, (Def.'s Ex. W at 93.)

Customs classified the CPU Boards and the Inboards as "computing" or "other data-processing machines" under Item 676.15, TSUS, assessing a duty of 3.9% ad valorem. It now claims the LAN Boards are also properly classified under Item 676.15, TSUS, and has abandoned its original classification for those Boards under Item 684.67, TSUS, as "[e]lectrical telegraph (including printing and type-writing) and telephone apparatus and instruments, and parts thereof: Other: Other." Item 684.67, Part 5, Schedule 6, TSUS (1987). Intel claims the Boards are properly classifiable as "[p]arts of automatic data-processing machines and units thereof, other than parts incorporating a cathode ray tube, duty free" under Item 676.54, TSUS. Intel seeks an order requiring Customs to reliquidate the Boards and refund duties paid. Trial was held in Portland, Oregon.

## DISCUSSION

■ The court reviews Customs' classification de novo, National Advanced Systems v. United States, 12 Fed.Cir. (T) ——, ——, 26 F.3d 1107, 1109 (1994), with the presumption that Customs' classification of the imported merchandise is correct; Intel bears the burden of overcoming this presumption.[3] 12 Fed.Cir. (T) at ——, 26 F.3d at 1109–10; Marcel Watch Co. v. United States, 11 Fed. Cir. (T) ——, ——, 11 F.3d 1054, 1056 (1993); see also 28 U.S.C. § 2639(a)(1) (1988).

---

3. With regard to the LAN Boards, the government has abandoned its classification under Item 684.67, TSUS in favor of Item 676.15, TSUS.

Accordingly, the presumption of correctness does not apply to the government's proposed classification of the LAN Boards. (See R. at 3.)

■ Intel's chief contention is that the Boards do not function as "computers," and therefore are not properly classified as such.[4] According to Intel, the Boards are of no use to consumers unless they are connected to other devices; accordingly, they must be classified as *"parts* of automatic data-processing machines and units thereof." Item 676.54, TSUS. Intel seeks to distinguish *National Advanced Systems,* which the government argues is controlling here, from the instant case. In *National Advanced Systems* the Federal Circuit, in affirming the Court of International Trade, found the processing unit at issue was properly classified as a computer even though, by itself, it could not perform useful work. 12 Fed.Cir. (T) at ——, 26 F.3d at 1110

The merchandise imported in *National Advanced Systems* was an "Additional Instruction Processor" (AIP), a component utilized to upgrade the Hitachi R–9 line of mainframe computers by giving the mainframe multitasking and parallel processing capability. *National Advanced Sys.,* 12 Fed. Cir. (T) at ——, 26 F.3d at 1108. Like the Boards, the AIP could not perform useful work until placed within the mainframe system. The AIP was "structurally and functionally similar to the R–9's primary instruction processor;" its function was to enhance the mainframe's existing processing capacity. 12 Fed.Cir. (T) at ——, 26 F.3d at 1108.

According to Intel, the two products are distinct. Intel cites differences in size, cost, structure, use, environment, and that the AIP appeared to have been finished, physically ready for use in the performance of computations, while the Boards must be further manufactured and assembled to become useful. As to this latter argument, Intel contends the lack of a Read–Only Memory Basic Input/Output System (ROM BIOS) on the Boards—individualized fixed software instructions programmed on the processor from which the computer takes its initial commands—precludes comparison between the Boards and the AIP.

■ These arguments are unpersuasive. "Item 676.15 is an eo nomine designation which includes all forms of the article." *National Advanced Sys. v. United States,* 12 Fed.Cir. (T) at ——, 26 F.3d at 1111 (quoting *Hasbro Indus. v. United States,* 7 Fed.Cir. (T) 110, 112, 879 F.2d 838, 840 (1989)). It is not confined by particular specifications such as the type or amount of memory, input/output capacity, or processing power. *See National Advanced Sys.,* 17 CIT 641, 644, 1993 WL 235613 (1993), *aff'd,* 12 Fed.Cir. (T) ——, 26 F.3d 1107 (1994); *see also Burroughs Corp. v. United States,* 11 CIT 291, 297, 664 F.Supp. 507, 513 (1987), *aff'd,* 6 Fed.Cir. (T) 117, 845 F.2d 321, *cert. denied,* 488 U.S. 854, 109 S.Ct. 140, 102 L.Ed.2d 113 (1988) (noting large amount of memory or storage capacity unnecessary for classification under Item 687.15, TSUS). The AIP performs essentially the same role as a processor chip found in personal computers. *National Advanced Sys.,* 17 CIT at 642. Therefore, while the AIP may be distinguished as "a large machine weighing hundreds of pounds, and comprised of many components," *id.,* the AIP is undifferentiated from the Boards in their fundamental purpose—to compute.

Moreover, that the fixed instructions (ROM BIOS) have yet to be installed does not preclude the Court from concluding that the Boards compute. *(See* R. at 179) (noting first general purpose computer lacked stored program capability). The court explores, rather, the fundamental *capabilities* of the Boards once such instructions—like other types of software—are in place. *See gener-*

---

4. Intel also argues, in its Reply, that the Boards are not "machines" within the meaning of Item 676.15, TSUS. Intel contends "to be a machine, the article must have some movable parts and 'it must utilize, apply, or modify force, or be used for the translation of motion.' " (Pl.'s Post Trial Reply Br. at 13 (quoting *APF Elecs. Inc. v. United States,* 82 Cust.Ct. 25, 29, C.D. 4784, 1979 WL 36957 (1979)).)

Intel defines "machine" out of context. The question is not if the device is a "machine;" it is, rather, if the merchandise is classifiable as a "computing machine." In the English language, the terms "computer" and "computing machine" are synonymous. *See Webster's Third New International Dictionary* 468 (1981 ed.). As the court noted in *National Advanced Systems,* "a computer is a type of computing machine. Thus, if the [device] meets the definition of a computer, it also satisfies the description 'computing machine' under Item 676.15." *National Advanced Systems,* 12 Fed.Cir. (T) ——, ——, 26 F.3d 1107, 1109 n. 3 (1994).

*ally Nord Light, Inc. v. United States,* 49 C.C.P.A. 12, 15, C.A.D. 786, 1961 WL 8691 (1961) (noting no requirement of self-activation for classification as machine); (*see also* R. at 203) (defining ROM BIOS as part of software provided to make programming easier by end user). Accordingly, the reasoning applied to uphold the classification of the AIP in *National Advanced Systems* applies with equal force to the classification of the Boards.

■ The Federal Circuit in *National Advanced Systems* found "the term 'computing machine' in Item 676.15 does not require stand-alone capability." *National Advanced Systems,* 12 Fed.Cir. (T) at ——, 26 F.3d at 1111. Accordingly, whether Intel's Boards need be attached to other components to be "useful" is irrelevant. 12 Fed.Cir. (T) at ——, 26 F.3d at 1111; *see Burroughs Corp.,* 11 CIT at 297, 664 F.Supp. at 513 (noting need to install keyboard, monitor, and other peripherals in order to create usable consumer product immaterial). The court does not agree with plaintiff's assertion that, for a computer to be as classified under Item 676.15, TSUS, it must be a completed product as found upon a showroom wall. The concepts of both computer and consumer are not static, and are not relevant to the classification process. The basic inquiry is whether the Boards compute.

For a device to compute, it must be capable of accepting information, applying prescribed processes to the information upon execution of commands from the user, and supplying the user with the results of these processes. *See National Advanced Sys.,* 12 Fed.Cir. (T) at ——, 26 F.3d at 1111. Further, nearly all the definitions have in common that, at the most fundamental level, a device is a computer if it is capable of carrying out calculations. 12 Fed.Cir. (T) at ——, 26 F.3d at 1111–12. The Court therefore looks to see whether the Boards perform these functions.

These functions are clearly present in each of the Boards. The Boards are capable of accepting information through serial and parallel interfaces, (R. at 194–95); (*see also* Pl.'s Ex. 5, iSBC 86/35 Single Board Computer Reference Manual, at 1–4, 1–6) (noting CPU board input-output capabilities); (Pl.'s Ex. 3 at 8–12, 8–14, 8–17—8–19) (providing iSBC 186/51 LAN board input-output capability); (R. at 76–77) (detailing Inboard's input-output capabilities), and storing that data along with the instructions needed to process the information in memory. (R. at 192–200); (*see* Pl.'s Ex. 4 at 3–55) (detailing iSBC 86/35 CPU board's memory capabilities and capacity); (Pl.'s Ex. 3 at 8–14) (noting iSBC 186/51 LAN board's memory capabilities and capacity). There is no requirement that the Boards possess direct input/output capacity, or permanent memory. *National Advanced Sys.,* 12 Fed.Cir. (T) at ——, 26 F.3d at 1112. The microprocessor on all three Boards performs fundamental calculations and manipulates information. (R. at 78–79, 192–200); (*see* Pl.'s Ex. 4 at 3–55) (noting Numeric Data Processor on iSBC 86/35 CPU board offers "arithmetic, trigonometric, transcendental, logarithmic, and exponential instructions"); (*see also* Pl.'s Ex. 3 at 8–12, 8–14) (noting iSBC 186/51 LAN board provides "an economical self-contained computer for applications in processing [including arithmetic functions] and local area network control"). The LAN Board—interconnecting multiple computers and their peripherals—computes through its transformation and orchestration of the data it administers as well as through implementing user applications. (R. at 196–98); (*see also* Pl.'s Ex. 3 at 8–13—8–14) (noting that iSBC 86/51 LAN Board serves both "computational and networking capacities"). The Boards return the transformed data through their respective input-output interfaces. (R. at 76–77, 194–95); (*see* Pl.'s Ex. 5 at 1–4, 1–6); (Pl.'s Ex. 3 at 8–12, 8–14, 8–17—8–18).

Accordingly, the court holds the Boards are devices capable of computing and satisfy the broad language of Item 676.15, TSUS.

## CONCLUSION

The court finds the Boards are properly classifiable under Item 676.15, TSUS. Plaintiff has not overcome the presumption of correctness with regard to Customs' classification of the Inboards and the CPU Boards. The court further finds the LAN Boards are properly classified under Item 676.15, TSUS.

## JUDGMENT ORDER

This action having been submitted for decision, after trial and upon due deliberation, in conformity with the decision rendered, it is hereby

**ORDERED** that Custom's classification of Intel's Inboard and CPU Board products under Item 676.15, TSUS, is affirmed; and it is further

**ORDERED** that Customs' proposed classification of Intel's LAN Boards under Item 676.15, TSUS, is accepted; and it is further

**ORDERED** that Customs reliquidate Intel's LAN Boards under Item 676.15, TSUS; and it is further

**ORDERED** that the action is dismissed.

