**AMERICAN BAYRIDGE
CORP., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Slip Op. 98–166.
Court No. 98–08–02682.**

United States Court of
International Trade.

Dec. 16, 1998.

Kirkland & Ellis (Kenneth G. Weigel, Paul F. Brinkman ), for Plaintiff.

Frank W. Hunger, Assistant Attorney General, Joseph I. Liebman, Attorney–in–Charge International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (Barbara S. Williams, Aimee Lee), Allan Martin, Office of Associate Chief Counsel, United States Customs Service (Louis Brenner Jr.), of counsel, for Defendant.

Dewey Ballantine, L.L.P. (Myles V. Lynk, John A. Ragosta, Frank J. Schweitzer, Timothy E. Punke, Dominick L. Bianchi, David A. Bentley), for amicus curiae, Coalition for Fair Lumber Imports.

Weil, Gotshal & Manges, L.L.P. (M. Jean Anderson), for amicus curiae, The Government of Canada.

Pepper Hamilton, L.L.P. (Elliot J. Feldman, Gregory C. Dorris), for amicus curiae, The Gouvernement du Québec.

## OPINION

BARZILAY, Judge.

### I. PROCEDURAL HISTORY

Following several countervailing duty investigations involving softwood lumber imports from Canada into the United States, see *Certain Softwood Lumber Products from Canada,* 57 Fed.Reg. 22,570 (Dept. Commerce 1992), the governments of Canada and the United States signed an agreement in 1996 providing for a ceiling on the number of board feet of such lumber permitted to be imported from Canada to the United States. Softwood Lumber Agreement, May 29, 1996, U.S.-Can., 25 I.L.M. 1197 (the "Agreement").

Exports from Canada were to be controlled by means of export permits and fees administered by the Canadian provincial governments. Imports classified within heading 44.07 of the Harmonized Tariff Schedule of the United States ("HTSUS") were specifically covered by the terms of the Agreement; imports classified within heading 44.18, HTSUS, were not. In 1997, North Star Wholesale Lumber ("North Star") sought a

classification ruling from the United States Customs Service ("Customs") on a product described as a predrilled stud. By ruling dated February 18, 1997, Customs classified these drilled spruce-pine-fir studs under subheading 4418.90.4040, HTSUS ("the North Star Ruling").

After initiating a notice and comment procedure, *see Tariff Classification of Drilled Softwood Lumber,* 62 Fed.Reg. 55, 667 (Dept. Treas.1997); *Tariff Classification of Drilled Softwood Lumber,* 63 Fed.Reg. 17,927 (Dept. Treas.1998); *Customs B. & Dec.* at 56–57 (Apr. 15, 1998), Customs revoked the North Star Ruling on July 1, 1998. Customs Ruling HQ 961555 (July 1, 1998).

The first Federal Register notice, soliciting comments on the issue of predrilled studs, stated:

until the resolution of this issue, we are restricting the determination in N.Y. B81564 [the North Star Ruling] to the facts of that specific case, and as such, there should be no reliance by third parties on N.Y. B81564 for prospective or future importations of drilled softwood lumber. Claims for detrimental reliance under § 177.9, Customs Regulations (19 CFR 177.9), will not be entertained for actions occurring on or after the date of publication of this notice.

62 Fed.Reg. 55,667 (Dept.Treas.1997).

In the revocation notice, Customs recited the effective date of the revocation as "effective for merchandise entered or withdrawn from warehouse for consumption on or after (60 days from date of publication in the Customs Bulletin)." HQ 961555. Nevertheless, in its administrative message announcing the revocation, Customs instructed its port personnel that the revocation would be effective on the date of publication for all importers except for North Star, the holder of the original ruling, and that such importations of predrilled studs would require permits pursuant to the Agreement. Admin. Message 98–0537 (July 1, 1998).

On June 30, 1998, the National Lumber and Building Materials Association, the National Association of Home Builders, the Canadian Wholesale and Remanufacturing Lumber Association and Jackpine Forest Products, Ltd. sought a declaratory judgment and permanent injunctive relief against Customs' revocation of the original ruling classifying the predrilled studs in HTSUS heading 44.18 and the failure to provide a sixty day grace period to third party importers, pursuant to 19 U.S.C. § 1625(c). *National Lumber and Bldg. Material Dealers Assoc. v. United States,* No. 98–06–02426 (CIT June 30, 1998). That action was dismissed on July 16, 1998, pursuant to an agreement among the parties providing for importation of the product at issue and an expedited liquidation, protest and litigation schedule.

This case is the result of the agreed-upon procedure, and presents the Court with two distinct issues: the proper classification of the predrilled studs, the merchandise at issue; and, whether 19 U.S.C. § 1625(c) grants third party importers a sixty day grace period, after proper revocation of an existing ruling, within which to continue importations under the previous classification.

## II. THE CLASSIFICATION ISSUE

### A. Background

Plaintiff, American Bayridge Corp. ("Bayridge"), has invoked this Court's jurisdiction under 28 U.S.C. § 1581(a), challenging a decision of Customs which denied Bayridge's protest filed pursuant to section 515 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1581(a) (1994). The action involves the proper classification of predrilled studs within Chapter 44 of the HTSUS.

Bayridge claims that its predrilled studs are properly classified under 4418.90.4040, HTSUS, as builder's joinery and carpentry of wood, or under 44.21, HTSUS, which provides for "other articles of wood." Customs classified the predrilled studs under 4407.10.0015, HTSUS, which provides for "wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or finger-jointed, of a thickness exceeding 6 mm: other: not treated: mixtures of spruce, pine and fir ('S–P–F')." The HTSUS provisions under consideration are as follows:

*Heading/Subheading    Article    Description*

4407    Wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or finger-jointed, of a thickness exceeding 6 mm:

    4407.10.00    Coniferous

        01    Finger-jointed
          Other:
        02    Treated with paint, stain, creosote or other preservative

          Not treated:

        15    Mixtures of spruce, pine, and fir ("S–P–F")

        . . .

---

*Explanatory Notes*[1]

    With a few exceptions, this heading covers all wood and timber, of any length but of a thickness exceeding 6 mm, sawn or chipped along the general direction of the grain or cut by slicing or peeling. Such wood and timber includes sawn beams, planks, flitches, boards, laths, etc., and products regarded as the equivalent of sawn wood or timber, which are obtained by the use of chipping machines and which have been chipped to extremely accurate dimensions, a process which results in a surface better than that obtained by sawing and which thereby renders subsequent planing unnecessary. It also includes sheets of sliced or peeled (rotary cut) wood, and strips and friezes for parquet flooring, other than those which have been continuously shaped along any of their edges or faces (heading 44.09).

    *    *    *

The products of this heading may be planed (whether or not the angle formed by two adjacent sides is slightly rounded during the planing process), sanded *or* end-jointed, *e.g.,* finger-jointed (*see* the General Explanatory Note to this Chapter).

The heading also excludes:

(a) Wood roughly squared, *e.g.,* by coarse sawing (heading 44.03).

(b) Chipwood and the like (heading 44.04).

(c) Veneer sheets and sheets for plywood (and other wood not elsewhere specified or included) of a thickness not exceeding 6 mm (heading 44.08).

(d) Wood continuously shaped along any of its edges or faces, of heading 44.09.

(e) Strips of plywood or veneered wood for parquet flooring (heading 44.12).

(f) Builders' joinery and carpentry (heading 44.18).

*Heading/Subheading    Article    Description*

1.  The Explanatory Notes constitute the Customs Co-operation Council's official interpretation of the Harmonized Tariff System. The Customs Co-operation Council was established in 1952 by convention in Brussels. The Customs Co-operation Council is now known as the World Customs Organization which publishes the *Harmonized Commodity Description and Coding System.* It has long been settled that "while the Explanatory Notes do not constitute controlling legislative history, they do offer guidance in interpreting HTS subheadings." *Lonza Inc. v. United States,* 46 F.3d 1098, 1109 (Fed.Cir.1995).

| Heading/Subheading | Article | Description |
|---|---|---|
| 4418 | | Builders' joinery and carpentry of wood, including cellular wood panels and assembled parquet panels; shingles and shakes: |
| 4418.10.00 | 00 | Windows, French-windows and their frames |
| 4418.20 | | Doors and their frames and thresholds: |
| 4418.20.40 | 00 | French doors |
| 4418.20.80 | | Other |
| | 30 | Flush doors |
| | 60 | Other |
| 4418.30.00 | 00 | Parquet panels |
| 4418.40.00 | | Formwork (shuttering) for concrete constructional work |
| 4418.50.00 | | Shingles and shakes |

\* \* \*

| Heading/Subheading | Article | Description |
|---|---|---|
| 4418.90 | | Other: |
| 4418.90.20 | 00 | Edge-glued lumber |
| 4418.90.40 | | Other |
| | 10 | Beams and arches, laminated |
| | 20 | Roof trusses |
| | 40 | Other fabricated structural wood members |
| | 50 | Prefabricated partitions and panels for buildings |
| | 90 | Other |

*Explanatory Notes*

This heading applies to woodwork, including that of wood marquetry or inlaid wood, used in the construction of any kind of building, etc., in the form of assembled goods or as recognizable unassembled pieces (*e.g.*, prepared with tenons, mortises, dovetails or other similar joints for assembly), whether or not with their metal fittings such as hinges, locks, etc.

The term "joinery" applies more particularly to builders' fittings (such as doors, windows, shutters, stairs, door or window frames), whereas the term "carpentry" refers to woodwork (such as beams, rafters and roof struts) used for structural purposes or in scaffoldings, arch supports, etc., and includes assembled shuttering for concrete constructional work. However, plywood panels, even if surface treated for the purposes of concrete shuttering, are classified in heading 44.12.

The parties have cross-moved for summary judgment. The Coalition for Fair Lumber Imports submitted an *amicus curiae* brief in support of Customs' motion for summary judgment. The Government of Canada and the Gouvernement du Québec each submitted an *amicus curiae* brief in support of Bayridge's motion.[2]

2. If Customs' classification is sustained, pre-drilled studs will be subject to the provisions of the Agreement, as it is currently interpreted. Customs argues that the Court should consider the Agreement in its classification decision. *See Def.'s Mem. Supp. Mot. Sum. J.* at 35. It does so by arguing "that the HTSUS should not be interpreted so as to be in conflict with the terms of the Agreement if another construction is possible." *Id.* Because the Court wishes to make it absolutely clear that the Agreement played no role in determining the outcome of this case, a brief discussion follows.

At oral argument the Court informed the parties that it was not inclined to entertain arguments about any perceived effect the Agreement has on this case. It did so because this case presents two issues: one involves classification under the HTSUS, the other involves interpretation of a domestic statute; here neither implicate international law. After reviewing the terms of the Agreement, the Court is convinced that it has no relevance to this case. The Agreement does not address the manner in which goods are to be classified, nor does it speak to modifying or revoking the treatment accorded by either party to the goods falling within the Agreement. Accordingly, the Agreement played no role in the Court's decision; and thus, it is not treated in the discussion that follows.

## B. Undisputed Facts

The merchandise at issue in this case consists of imported kiln-dried stud grade lumber, measuring two inches by six inches, in nominal lengths of eight feet, and featuring two one inch diameter holes drilled in the center of the face of each board about sixteen inches from each end ("predrilled studs"). *Pl.'s Stat. Undisputed Facts* ¶ 1; *Def.'s Stat. Undisputed Facts* ¶ 1; *Compl.* ¶ 4. The merchandise is manufactured from stud grade lumber.[3] *Def.'s Stat. Undisputed Facts* ¶ 1; *Pl.'s Resp. to Def.'s Stat. Undisp. Facts* ¶ 1.

Bayridge entered a test shipment of predrilled studs on July 16, 1998. Customs liquidated Bayridge's test shipment on July 17, 1998, and classified the goods under heading 4407.10.0015, HTSUS. Bayridge immediately filed a protest, which was denied by Customs on August 14, 1998. Bayridge claims that the predrilled lumber should be classified as builders' joinery and carpentry of wood under HTSUS 4418.90.4040, or, alternatively, under HTSUS 44.21, which provides for "[o]ther articles of wood."

## C. Legal Arguments

Customs contends that predrilled studs are classifiable only under heading 44.07, HTSUS, because they are dimensional lumber, sawn lengthwise, and the holes drilled into the face of the lumber do not make it a more processed wood article deserving classification in a later subheading. *Def.'s Mem. Supp. Mot. Sum. J.* at 28 ("*Def.'s Mem.*"). Customs asserts that heading 44.07 is meant to be broad in scope and that restrictions may not be inferred if not specifically enumerated in the language of the provision. *Id.* at 36.

Customs posits that even though the word "drilled" was dropped from the Tariff Schedule of the United States ("TSUS") in its incarnation as the HTSUS, drilled lumber still falls under heading 44.07 because the intent of that provision has remained the same. *Id.* at 32–33. Customs points to an International Trade Commission concordance, prepared before promulgation of the HTSUS, regarding TSUS 202.03–202.30, 202.52 and 202.54, which indicates that those TSUS provisions were converted to heading 44.07, HTSUS. *Amicus' Mem. Supp. Def.'s Mot. Sum. J.* at Ex. 4 ("*Amicus' Mem.*"). Thus, Customs contends that heading 44.07 was drafted to include drilled wood products.

Customs also argues that the HTSUS was intended to remain revenue neutral in its conversion from the TSUS. *Def.'s Mem.* at 32. Customs relies upon *Anhydrides & Chemicals, Inc.,* in which the court reiterated the administrative mandate that "conversions to the harmonized system would leave existing duty rates undisturbed as much as possible." *Anhydrides & Chemicals, Inc. v. United States,* 130 F.3d 1481, 1484 (Fed.Cir.1997). Thus, Customs argues, predrilled lumber should be classified under 44.07 because, under the TSUS equivalent of 44.07, drilled lumber was duty free, while under 44.18, there is a duty to be paid.[4] *Id.* at 33.

Customs further argues that heading 44.07 includes many unlisted processes, such as cutting to length, kiln drying, easing, grading, treating, end sealing, marking, and precision end cutting, and that these processes are conceded to be within 44.07. *Id.* at 40–41. Customs argues that if wood subject to these processes were excluded from subheading 44.07, then all dimensional lumber would be excluded from 44.07. *Id.* at 42.

Finally, Customs asserts that predrilled lumber is not classifiable under heading 44.18, HTSUS, because it is not "joinery and carpentry of wood." *Id.* at 42–45. Customs argues that "joinery and carpentry of wood" require more than drilling a hole in the stud, and include more advanced products. *Id.* at

---

**3.** A stud is defined as:

A framing member, usually cut to a precise length at the mill and designed to be used in framing building walls with little or no trimming before it is set in place. Studs are most often 2x4s, but 2x3s, 2x6s, and other sizes are also included in the stud category; studs may be of wood, steel, or composite material.

*Amicus' Mem. Supp. Def.'s Mot. Sum. J.* at Ex.2 (citing Random Lengths, Terms of The Trade at 268 (3d ed.1993)).

**4.** However, Canadian products classified within heading 44.18 are exempt from duty under the North American Free Trade Agreement.

45. Customs also posits that it would be illogical to read heading 44.07 as excluding wood that has been subject to drilling on the basis that drilling is too complicated a process, when wood that has been finger jointed, a far more complicated process, is specifically included within the heading.[5] *Id.* at 39–40.

Bayridge argues that predrilled lumber is properly classifiable under heading 44.18, HTSUS. Bayridge asserts that heading 44.07 is not an *eo nomine* provision covering all studs or lumber because it "neither names 'studs' nor describes drilled lumber." *Pl.'s Mem. Supp. Mot. Sum. J.* at 10–11 ("*Pl.'s Mem.*"). Rather, heading 44.07 "describes the processes to which wood may be subjected," and, since drilling is not included in that list of processes, it may not be included under that classification. *Id.* at 11.

Bayridge posits that the Explanatory Notes to heading 44.07 offer no clue that drilling would be included in the processes enumerated, but that the language in the Explanatory Notes is specific enough in its enumeration of processes that drilling would fall outside of its scope since it is not listed. *Id.* at 16. In addition, Bayridge offers the Explanatory Notes to heading 44.09, HTSUS, as evidence of Congressional intent to exclude drilling from heading 44.07. *Id.* at 12. The Explanatory Notes to heading 44.09 provide, in relevant part:

> This heading covers wood ... which after sawing or squaring, has been continuously worked along any of its edges or faces either to facilitate subsequent assembly or to obtain ... mouldings ..., whether or

not planed, sanded or end-jointed, e.g., finger-jointed.

. . . . .

This heading also covers strips or friezes for parquet flooring ... provided they have been continuously shaped, e.g., tongued and grooved. If they have not been worked beyond planing, sanding, or end-jointing, e.g., finger-jointing, they fall in heading 44.07.

. . . . .

This heading also excludes:

. . . . .

(e) Wood which has been surface worked beyond planing or sanding, other than painting, staining or varnishing (*e.g.*, veneered, polished, bronzed, or faced with metal leaf).

Thus, given the above cited language, Bayridge argues that it is clear that Congress intended to limit the scope of heading 44.07 to the enumerated processes. Moreover, Bayridge relies upon *Amity Leather Co. v. United States,* —— CIT ——, 939 F.Supp. 891 (1996), to support its proposition that Congress intended the limited scope of heading 44.07. *Id.* at 15.

Bayridge further argues that various Customs rulings have excluded from classification in heading 44.07 lumber processed by methods other than those enumerated. *Id.* at 19. Thus, Bayridge asserts that Customs' present interpretation is inconsistent with currently valid rulings[6] and argues that

---

**5.** "Fingerjoint—A method of joining two pieces of lumber end-to-end by sawing into the end of each piece a set of projecting 'fingers' that interlock. When the pieces are pushed together, these form a strong glue joint." *Def.'s Mem.* at Ex. 7 (citing Random Lengths, Terms of The Trade at 105 (3d ed.1993)). Subheading 4407.10.00.01, specifically provides for finger jointed wood.

**6.** Bayridge lists the following eight rulings:
1) "2x4 softwood 'boards into which one or two notches have been cut' to 'recess electrical wiring and then cover (the wiring) with a metal plate' for use 'in the construction of walls in houses or mobile homes;'" Customs Service Ruling B85796 (June 4, 1997);
2) "boards with angle-cut ends for use in building roof trusses." Customs Service Ruling B81359 (Feb. 6, 1997);

3) "boards with one edge and two ends rounded for use as staircase steps." Customs Service Ruling A89572 (Dec. 11, 1996);
4) "boards 'rough sawn [with] both ends ... cut at a 45 degree angle' for use as 'supports or bridging between floor joists'" Customs Service Ruling B80541 (Jan. 15, 1997);
5) "boards with 'edges [that] have been shaped to a decorative pattern that is not continuous down the length' for use as 'the side railings of decks in a manner similar to balusters.'" *Id.;*
6) "boards with radial-cut ends for use in building bed frames." Customs Service Ruling 960703 (Aug. 26, 1997);
7) "'dressed boards' run through a 'broken knife planer' to give it a rough texture." Customs Service Ruling 803538 (November 3, 1994). Customs Service Ruling 880658 (Dec. 17, 1992), and

these rulings clearly indicate that wood that has undergone a process not listed in heading 44.07, may not be classified under that heading. *Id.* at 18–21.

Bayridge contends that the proper classification for its drilled lumber is under heading 44.18, HTSUS, as carpentry of wood. *Id.* at 25. Bayridge offers two definitions of carpentry from the Oxford English Dictionary. First, Bayridge asserts that carpentry may be " 'the art of cutting, working, and joining timber into structures.' " Second, it asserts that carpentry may be the " 'timber work constructed by the carpenter.' " Thus, Bayridge argues that its predrilled studs are carpentry since they are specifically "fashioned for a particular use in construction of a structure." *Id.* at 25–26. Bayridge asserts that predrilled studs are "dedicated carpentry" and that the particular use is exclusively for wall studs. *Id.* at 27. In addition, Bayridge argues that predrilled studs are fabricated structural wood members. *Id.* at 28. Bayridge asserts that the studs are fabricated carpentry because of the precise drilling required to manufacture properly centered and cut holes into the stud. *Id.* at 29.

## D. Standard of Review

This case is before the Court on the parties' cross motions for summary judgment. Under USCIT R. 56(d), summary judgment is appropriate if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

■■ Both parties posit that this case is ripe for adjudication by means of summary judgment. The Court agrees. Even though there are differences in the factual positions advanced by each party, summary judgment is appropriate in this action because there are no genuine issues of material fact in dispute. The parties agree on the physical characteristics and details of the imported merchandise, but dispute the classification. Thus, the material facts as to what constitutes the merchandise are not at issue. *See Bausch & Lomb, Inc. v. United States,* 21 CIT ——, 957 F.Supp. 281, 284 (1997), *aff'd,* 148 F.3d 1363, 1998 U.S.App. LEXIS 15175 (Fed.Cir.1998). The Court is then left with the purely legal question involving the meaning and scope of the tariff provision and whether it includes the imported merchandise. *See National Advanced Systems v. United States,* 26 F.3d 1107, 1109 (Fed.Cir. 1994). Although there is a statutory presumption of correctness for Customs' decisions, 28 U.S.C. § 2639(a)(1) (1994), when the Court is presented with a question of law in a proper motion for summary judgment, that presumption does not apply. *Blakley Corp. v. United States,* —— CIT ——, 15 F.Supp.2d 865, 869 (1998), (quoting *Universal Electronics Inc. v. United States,* 112 F.3d 488, 492 (Fed.Cir.1997) ("[b]ecause there was no factual dispute between the parties, the presumption of correctness is not relevant.")) *See also Goodman Manufacturing, L.P. v. United States,* 69 F.3d 505, 508 (Fed.Cir. 1995). Therefore, the Court must examine both parties' claimed classifications and independently determine which of them is correct, or, if neither, take further measures to determine the correct classification. 19 U.S.C. 2643(b) (1994).

## E. Discussion

■ Rule 1 of the General Rules of Interpretation ("GRI 1") of the HTSUS provides that "classification shall be determined according to the terms of the headings and any relative section or chapter notes." The Court must "first construe[ ] the language of a heading ... to determine whether the product at issue is classifiable under the heading. Only after determining that a product is classifiable under the heading should the court look to the subheadings to find the correct classification." *Orlando Food Corp. v. United States,* 140 F.3d 1437, 1440 (Fed.Cir.1998). If the words of a heading are unclear, the Court may then look to legislative intent for clarification. *Sabritas S.A. de C.V. v. United States,* 22 CIT ——,

---

8) " 'dimensional ... softwood that has been run through a rough header machine with claws' to achieve a 'rough-combed' look."

Customs Service Ruling 880658 (Dec. 17, 1992).

930

998 F.Supp. 1123, 1127 (1998). In the case at bar, the merchandise is classifiable under heading 44.07 because such classification fulfills the legislative intent of that provision. Moreover, predrilled studs are not classifiable under heading 44.18 because they are not "joinery and carpentry of wood".

Predrilled studs literally satisfy heading 44.07 because they consist of "wood sawn or chipped lengthwise ... of a thickness exceeding 6 mm." The drilling of a hole in the face of the stud does not take the merchandise out of 44.07 for two reasons. First, the heading is meant to have broad application. Second, the legislative intent in converting the TSUS to the HTSUS clearly shows that drilled studs were meant to be covered by heading 44.07.

First, heading 44.07 is meant to be a broad provision. Wood classified under 44.07 necessarily undergoes a number of unlisted processes. Both parties agree that edging, kiln drying, easing, cutting to length, and precision end trimming are some of those processes which are permissible under 44.07, yet remain unlisted. Bayridge's assertion that these unlisted processes "are processes to create the lumber rather than processes done to the lumber that create new wood articles," *Pl.'s Reply Br.* at 14, undermines its *expressio unius est exclusio alterius* argument because it concedes that all processes need not be listed in order for wood, which has undergone such processes, to be classifiable under heading 44.07. Thus, Bayridge's argument that any unlisted process must be excluded from 44.07 is untenable.

■ The Explanatory Notes further illustrate the breadth of heading 44.07. The Explanatory Notes clearly state that heading 44.07 is meant to cover *all* wood with *few* exceptions, namely those articles specifically provided for in subsequent headings. Although not determinative, the Explanatory Notes are endorsed by Congress and mani-

fest legislative intent. *See Bausch & Lomb, Inc.,* 957 F.Supp. at 288. The Court may not read restrictive language into heading 44.07 where none was intended. Had Congress intended to limit 44.07, Congress would have chosen "more forceful words to express that intent." *See Norman G. Jensen, Inc. v. United States,* 2 CIT 198 (1981). Indeed, Congress has utilized restrictive language to limit the applicability of a heading in other HTSUS provisions.[7] Thus, the Court cannot read heading 44.07 as limited to enumerated processes unless clearly specified by Congress.

Bayridge relies upon *Amity Leather* for the proposition that predrilled studs were not meant to be included under heading 44.07 since the word "drilled" was dropped from the TSUS in its conversion to the HTSUS. In that case, this Court analyzed the classification of a change purse made of non rigid plastic and textile. *Amity Leather,* 939 F.Supp. at 893. The merchandise was classified under the HTSUS as a non rigid plastic flat good not made "of reinforced or laminated plastics," and was subject to a lower duty rate than that merchandise would have been subject to under the equivalent TSUS provision. *Id.* at 892. Under the TSUS, the "reinforced or laminated" provision required and defined "rigidity." *Id.* at 893. Under the HTSUS, the requirement for rigidity was dropped from the provision for "reinforced or laminated" merchandise. *Id.* at 893–94.

Plaintiffs, domestic manufacturers of non rigid plastic flat goods, challenged the lower tariff classification and sought a narrow definition of the terms "reinforced or laminated," to include the requirement of rigidity which existed in the TSUS. *Id.* at 894. This court held that the rigidity requirement could not be read into the HTSUS classification. *Id.* at 898. This court found that the omission of the definition in the HTSUS was deliberate, and could not be read back into the statute. *Id.* at 896–97. This court explained that a

7. For example:

HTSUS 7211: "Flat-rolled products of iron or nonalloy steel, of a width less than 600mm, not clad, plated or coated: Not further worked than hot-rolled...."

HTSUS 7214: "Other bars and rods of iron or nonalloy steel, not further worked than forged, hot rolled hot drawn or hot extruded, but including those twisted after rolling...."

HTSUS 7219: "Flat-rolled products of stainless steel, of a width of 600mm or more [:] Not further worked than cold-rolled...."

plain reading of the HTSUS provision led to a clear outcome, and that resorting to the TSUS was not necessary since the statute was clear. *Id.* at 895–96. Bayridge's reliance upon *Amity Leather* is misplaced. In contrast to *Amity Leather,* the specific meaning of a word in the HTSUS provision is not at issue here. In *Amity Leather* it was logical for the court to conclude that the omission of the word "rigidity" from the HTSUS, which had appeared in the TSUS provision, was significant in determining the meaning of the terms "reinforced," "laminated," "reinforced plastic," or "laminated plastic." In the case at bar, it is not the definition of heading 44.07 which is in dispute, but the plain meaning of the provision when read together with its Explanatory Notes.

In addition, the court in *Amity Leather* explained that:

> where the statutory language of the HTSUS is clear, resort to the TSUS is not necessary; if the HTSUS term is clear, e.g., the common and commercial meaning of a term are the same and alternate meanings are not apparent from the context of the statute, the existence of a prior statutory definition in the TSUS does not create an ambiguity in the HTSUS.

*Id.* at 895–96 (citations omitted). From its analysis of heading 44.07, it is clear to the Court that there is no ambiguity as to the broad application of the provision, and to its application to predrilled studs.

Bayridge's reliance upon a series of Customs' rulings and upon the Explanatory Notes for heading 44.09 is misguided. The merchandise at issue in the rulings cited involved lumber that had been further worked and therefore subjected to more processing than merely drilling two holes—one in each end—as in a predrilled stud. Furthermore, the Court is not bound by Customs' rulings. *See Skaraborg Invest USA, Inc. v. United States,* 22 CIT ——, 9 F.Supp.2d 706, 709 (1998); *see also United States v. Hitachi Am., Ltd.,* 21 CIT ——, 964 F.Supp. 344, 361 (1997). In addition, the Explanatory Notes upon which Bayridge relies relate to parquet flooring, not studs. The fact that the merchandise in the various rulings was classified under heading 44.18,

and that Explanatory Notes to heading 44.09 relate to parquet flooring, does not assist the Court in determining the appropriate classification for predrilled studs.

Finally, the history of the conversion of the TSUS to the HTSUS further confirms that predrilled studs are rightfully classified within heading 44.07. Headings 202.03–202.30, and 202.52, and 202.54, TSUS, provided for lumber in various forms. Specifically, heading 202.52 provided for "[s]oftwood lumber and siding, *drilled,* or pressure treated." TSUS (1987) (emphasis added). In addition, these headings were subject to a zero general duty rate. *Id.* In a concordance promulgated by the International Trade Commission, addressing a heading by heading cross-reference of TSUS classifications with their newly converted counterparts in the HTSUS, headings 202.03–202.30, 202.52 and 202.54 were all converted to heading 44.07, and also subject to a zero general duty rate. *Continuity of Import and Export Trade Statistics After Implementation of the Harmonized Commodity Description and Coding System,* Inv. No. 332–250, USITC Pub. No.2051, at 32 (Jan.1998). A concordance is instructive in determining legislative intent and proper HTSUS classification. *See, e.g., Marubeni Am. Corp. v. United States,* 35 F.3d 530, 533 (Fed.Cir.1994). The Court may also consider the revenue neutral intent of the HTSUS in making its decision. *See Anhydrides & Chemicals, Inc.,* 130 F.3d at 1483–84.

The concordance and the general duty rates illustrate that drilled or undrilled studs were intended to be classified under heading 44.07, HTSUS. The concordance clearly sets forth that lumber should be classified under heading 44.07. Also, following their treatment under the TSUS, drilled or undrilled studs receive a general duty rate of zero under heading 44.07, HTSUS. Should the Court classify predrilled studs under heading 44.18, they would be subject to a general duty rate of 3.6% which would contravene the concordance. Clearly, this result is not what Congress intended. In converting from the TSUS to the HTSUS, Congress did not intend to impose duty upon predrilled studs. Congress intended predrilled studs to be classified under heading 44.07, as indicated in

the concordance, and not under heading 44.18, as Bayridge asserts.

The predrilled studs are not classifiable under heading 44.18, HTSUS, as "joinery and carpentry of wood." Bayridge argues that predrilled studs are carpentry because they are dedicated to use as vertical wall frame members. Bayridge has provided the Court with documentary evidence supporting that position. Likewise, Customs has provided documentary evidence supporting its position that predrilled studs are no more dedicated to use as wall frames than are undrilled studs. However, the Court need not undertake an analysis of use because heading 44.18 is not a use provision and the Court finds that predrilled studs do not fit the definition of "joinery and carpentry of wood."

Heading 44.18 provides for "joinery and carpentry of wood." By examining the terms of the heading, pursuant to GRI 1 and the Explanatory Notes, the Court concludes that predrilled studs are not "joinery and carpentry of wood." Although "joinery and carpentry of wood" are not specifically defined in the HTSUS, the Explanatory Notes provide some guidance in ascertaining the intent of heading 44.18. The Explanatory Notes state that heading 44.18:

> applies to woodwork, including that of wood marquetry or inlaid wood, used in the construction of any kind of building, etc., in the form of assembled goods or as recognizable unassembled pieces (*e.g.*, prepared with tenons, mortises, dovetails or other similar joints for assembly), whether or not with their metal fittings such as hinges, locks, etc.
>
> The term "joinery" applies more particularly to builders' fittings (such as doors, windows, shutters, stairs, door or window frames), whereas *the term "carpentry" refers to woodwork (such as beams, rafters and roof struts) used for structural purposes or in scaffoldings,* arch supports, etc., and includes assembled shuttering for concrete constructional work. However, plywood panels, even if surface treated for

the purposes of concrete shuttering, are classified in heading 44.12.

[Emphasis added].

▮ When read together, the above cited provisions of the Explanatory Notes to heading 44.18 require that in order to be recognized as "carpentry of wood," woodwork must be used for structural purposes in the construction of a building in the form of assembled goods or recognizable unassembled pieces. To be a "recognizable unassembled piece," the woodwork must be "prepared with tenons, mortises, dovetails or other similar joints for assembly." Therefore, the term "carpentry" refers to woodwork used for structural purposes that is also either an assembled, or a recognizable unassembled good featuring a joint for assembly into the structure. Bayridge asserts that predrilled studs are recognizable as unassembled pieces of a wall frame, and, therefore, fit the definition of builders' joinery and carpentry. However, this position is untenable as predrilled or undrilled studs become part of a wall frame by virtue of the fact that they are graded as studs.[8] Neither predrilled nor undrilled studs feature any kind of recognizable joint and are joinable to a wall frame merely because they are cut to length and are graded as studs; the one inch hole in the face of a predrilled stud is not a joint or usable as a joint. Thus, a predrilled stud does not meet the description of "joinery and carpentry of wood" or the criteria outlined in the Explanatory Notes any more than does an undrilled stud.

▮ Moreover, a reading of various definitions of "carpentry" and "joinery" also leads the Court to conclude that predrilled studs are neither carpentry nor joinery. It is well established that when a tariff term is not specifically defined and the legislative history is insufficient in establishing a definition, "the term is to be construed in accordance with its common and popular meaning." *E.M. Chemicals v. United States*, 920 F.2d 910, 913 (Fed.Cir.1990). In ascertaining common meaning, the Court may rely upon its own understanding of the term, or

---

**8.** *Amicus' Mem.* at Ex. 15 (citing International Code Council, International Building Code 2000

§ 2308.9 (July 1998, Final Draft)).

may consult standard lexicographic and scientific authorities, as well as testimony of record and other reliable sources of information. *See Brookside Veneers, Ltd. v. United States,* 847 F.2d 786, 789 (Fed.Cir.1988). *See Trans–Atlantic Co. v. United States,* 60 C.C.P.A. 100, 471 F.2d 1397, 1398 (Fed.Cir. 1973).

> Carpentry and joinery are defined as:
>
> carpentry: (1) the art or trade of a carpenter; *specif:* the art of shaping and assembling structural woodwork (as in constructing buildings) (2) timberwork constructed by a carpenter; *specif:* an assemblage of pieces of timber connected by being framed together (as in a roof).

*Webster's Third New International Dictionary,* at 343 (1971).

> carpentry: ... the art of cutting, working, and joining timber into structures; [t]imber work constructed by the carpenter.

*II Oxford English Dictionary,* at 128 (1970).

> carpentry: ... work which is performed by a craftsman; or cutting, framing, and joining pieces of timber in the construction of ships, houses and other structures of a similar character.
>
> joinery: term used by woodworkers when referring to the various types of joints used in woodworking. Wood joints commonly used in timber framing, in edge joining of boards, and other forms of woodworking....

*Architectural and Building Trades Dictionary,* at ___ (1974).

These sources illustrate that carpentry is not merely a stud with a one inch hole in its face. In order for merchandise to be classified as "joinery and carpentry of wood," it must be more complex than Bayridge's predrilled studs, and it must feature a joint so that the timber may be joined to the structure or to another piece of timber in the process of construction. Drilling a hole in a stud is not synonymous with the art of shaping woodwork, or assembling or joining timber for the construction of a structure. In addition, drilling does not change the essential outside shape which predrilled and undrilled studs have in common; both are graded as studs and are dimensionally identical. Moreover, predrilled studs do not feature any joints. To hold that a predrilled stud is classifiable as "joinery and carpentry of wood," would mean that any piece of dimensional lumber, without more, which could be used in the building of a structure, could potentially be classified as "joinery or carpentry of wood." Clearly, that is not the case.

In addition, Bayridge's alternate argument, contending that predrilled studs are *prima facie* classifiable within both headings 44.07 and 44.18, and as such should be classified in the later provision, pursuant to GRI 3,[9] is also without merit. Predrilled studs are not *prima facie* classifiable anywhere other than in heading 44.07; thus, resort to GRI 3 is unnecessary.

The Court also cannot accept Bayridge's final argument, which proposes that, if predrilled studs are not classifiable within heading 44.18, the Court should classify them in heading 44.21. The Court has concluded that predrilled studs are classifiable within heading 44.07. Classification under heading 44.21

---

9. GRI 3 provides:
   When, by application of rule 2(b) or for any other reason, goods are, *prima facie,* classifiable under two or more headings, classification shall be effected as follows:
   (a) The heading which provides the most specific description shall be preferred to headings providing a more general description. However, when two or more headings each refer to part only of the materials or substances contained in mixed or composite goods or to part only of the items in a set put up for retail sale, those headings are to be regarded as equally specific in relation to those goods, even if one of them gives a more complete or precise description of the goods.
   (b) Mixtures, composite goods consisting of different materials or made up of different components, and goods put up in sets for retail sale, which cannot be classified by reference to 3(a), shall be classified as if they consisted of the material or component which gives them their essential character, insofar as this criterion is applicable.
   (c) When goods cannot be classified by reference to 3(a) or 3(b), they shall be classified under the heading which occurs last in numerical order among those which equally merit consideration.

cannot be appropriate because heading 44.21 is a basket provision for "Other articles of wood." These articles of wood are further processed, value added articles of wood. Predrilled studs are not sufficiently processed to qualify as "Other articles of wood" under 44.21, HTSUS.

In determining that predrilled studs are not further processed, value added articles of wood, the Court is persuaded by cases decided under the TSUS.[10] These cases indicate that for lumber to be classified as an "article of wood," it must have been processed to the extent that it ceased to be lumber and had become the article itself. *Permagrain Products, Inc. v. United States,* 9 CIT 426, 435, 623 F.Supp. 1246, 1253 (CIT 1985), *aff'd* 791 F.2d 914 (Fed.Cir.1986) (citing *A.N. Deringer, Inc. v. United States,* 61 Cust. Ct. 66, 73, 287 F.Supp. 1016, 1021 (1968)) (holding that unfinished hardwood flooring blanks were properly classified as other hardwood flooring and not as hardwood lumber); *American Plywood Assoc. v. United States,* 17 CIT 613, 617 (1993) (holding that merchandise consisting of laminated plies of wood, after passing through a specialized machine that rough-sawed the face, cut grooves into the face, and cut rabbetted edges, was advanced beyond the basic fungible material known as plywood); *Border Brokerage Co., Inc. v. United States,* 69 Cust. Ct. 130, 138, 69 Cust.Ct. 130, 349 F.Supp. 1011, 1016 (Cust.Ct.1972) (citing *Deringer,* and holding that a dadoed door-jamb set consisting of two grooved pieces of wood and a top piece without a groove was not lumber because it had been so manufactured that it ceased to be a material and had become the article itself, *i.e.,* a dadoed door-jamb set).

The Court is unpersuaded by Bayridge's argument that predrilled studs are classified as an article of wood since, arguably, they only have one use. On this point, the Court finds *Deringer* persuasive. In *Deringer* the U.S. Customs Court determined the classification of "horsefeathers," which consisted of lumber sawn both longitudinally and crosswise, then resawn at an angle for exclusive use in roofing applications. 287 F.Supp. at

1022. That court stated, "horsefeathers are less advanced from a processing standpoint than 'dressed lumber' and 'worked lumber'. . . . Yet [those products] are classifiable as lumber. Even products which have been drilled or treated are so classified." *Id.* at 1023. That court held that the classification of horsefeathers as lumber did not change simply because the products "are 'used for one thing only' or are so far advanced that they 'can be used only for a definite purpose.'" *Id.* "Horsefeathers" were lumber to be used in a particular way. Thus, even if the Court were to accept that predrilled studs have only one use, that does not make the product an "article of wood" classifiable in 44.21. *See also United States v.C.S. Emery & Co.,* 18 C.C.P.A. 208, 211, 1930 WL 2530 (1930) (distinguishing previous cases holding processed wood was still just lumber ("[t]he ceiling boards were not ceilings, the flooring boards were not floors") and holding that doorsills and stair rails manufactured of wood were articles of wood and not lumber because the wood had been processed into the article itself); *B.A. McKenzie & Co., Inc. v. United States,* 39 Cust. Ct. 52, 55, 57, C.D. 1903 (1957) (finding that joining two pieces of narrow wood with a Linderman joint and gluing under pressure to form one wide piece of wood to be used in the manufacture of drawer sides did not change the character of the wood as lumber and holding that the merchandise was not classifiable as a manufacture of wood because more manufacturing was needed to make it into a drawer side); *C.J. Tower & Sons v. United States,* 40 C.C.P.A. 30, 32–33, 1952 WL 5910 (1952) (holding that wooden parts cut in accordance with detailed blue print specifications in order to form a specialized shipping crate were manufactures of wood because the varied cuts and grooves made in the wood in Canada caused it to lose its identity as lumber material and become a recognizable article).

The Court finds that predrilled studs are properly classified within heading 44.07, HTSUS, and not within either heading 44.18, HTSUS, as carpentry, or heading 44.21,

---

**10.** Whereas early tariff acts used the term "manufactures of wood," the TSUS used the term "articles of wood" as does heading 44.21, HTSUS.

HTSUS, as other articles of wood. Therefore, it grants Customs' cross motion for summary judgment, and denies Bayridge's motion, affirming Customs' classification of predrilled studs as classifiable under 4407.10.0015.

## III. INTERPRETATION OF 19 U.S.C. § 1625

The Customs Modernization Act ("Mod Act") was passed as part of the North American Free Trade Agreement Implementation Act ("NAFTA"), Pub.L. 103–182 § 623 (1993), and substantially amended section 625 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1625 (1994), which had been unchanged for fifteen years since its addition to the Tariff Act of 1930 by Pub.L. 95–410 in 1978. Former section 625 required the Secretary of the Treasury to publish any precedential decision within 120 days of issuance in the Customs Bulletin, or in such other way so as to be available for public inspection.[11] Current section 625 is a marked change from the old statute.[12] The additions to section

625 change the procedures regarding appeals, publication of decisions that limit court decisions, and publication of certain information. Customs has yet to implement new regulations to account for the statutory changes. Only one of the new sections is in contention, however, for the only question raised in this case is whether Customs retains the discretion to delay the effective date of a final ruling or decision. This issue, in turn, presents a straightforward question of statutory interpretation.

### A. Standard of Review

When a court reviews an agency's construction of a statute it must, in the first instance, discern whether Congress has directly spoken to the precise question at issue. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). " 'If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambig-

---

11. Former section 625 read as follows:

Within 120 days after issuing any precedential decision (including any ruling letter, internal advice memorandum, or protest review decision) under this chapter with respect to any customs transaction, the Secretary shall have such decision published in the *Customs* Bulletin or shall otherwise make such decision available for public inspection.

12. Current section 625 reads as follows:

(a) Within 90 days after the date of issuance of any interpretive ruling (including any ruling letter, or internal advice memorandum) or protest review decision under this chapter with respect to any customs transaction, the Secretary shall have such ruling or decision published in the *Customs* Bulletin or shall otherwise make such ruling or decision available for public inspection.

(b) A person may appeal an adverse interpretive ruling and any interpretation of any regulation prescribed to implement such ruling to a higher level of authority within the Customs Service for de novo review. Upon a reasonable showing of business necessity, any such appeal shall be considered and decided no later than 60 days following the date on which the appeal is filed. The Secretary shall issue regulations to implement this subsection.

(c) Modification and revocation

A proposed interpretative ruling or decision which would—

(1) modify (other than to correct a clerical error) or revoke a prior interpretive ruling

or decision which has been in effect for at least 60 days; or

(2) have the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions;

shall be published in the Customs Bulletin. The Secretary shall give interested parties an opportunity to submit, during not less than the 30–day period after the date of such publication, comments on the correctness of the proposed ruling or decision. After consideration of any comments received, the Secretary shall publish a final ruling or decision in the Customs Bulletin within 30 days after the closing of the comment period. The final ruling or decision shall become effective 60 days after the date of its publication.

(d) A decision that proposes to limit the application of a court decision shall be published in the Customs Bulletin together with notice of opportunity for public comment thereon prior to a final decision.

(e) The Secretary may make available in writing or through electronic media, in an efficient, comprehensive and timely manner, all information, including directives, memoranda, electronic messages and telexes which contain instructions, requirements, methods or advice necessary for importers and exporters to comply with the Customs laws and regulations. All information which may be made available pursuant to this subsection shall be subject to any exemption from disclosure provided by section 552 of Title 5.

uously expressed intent of Congress.'" *F.lli de Cecco Di Fillippo Fara San Martino S.P.A. v. United States,* Slip Op. 97–143 (CIT 1997) (quoting Chevron U.S.A. Inc. v. Natural Resources Defense Council Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

The language of the new portion of the statute at issue here, 19 U.S.C. § 1625(c), squarely addresses the matter in controversy and clearly reveals the intent of Congress with regard to the timing of the effective date of any modification and/or revocation. The section first sets out the two types of decisions that require publication: one which modifies a prior ruling in effect for at least sixty days, 19 U.S.C. § 1625(c)(1), and one which would have the effect of modifying the treatment previously accorded substantially identical transactions, 19 U.S.C. § 1625(c)(2). The main body of section 625(c) then proceeds to require publication in the Customs Bulletin, a comment period of at least thirty days, publication of the final ruling in the Customs Bulletin within thirty days after the comment period closes and the following language: "[T]he final ruling or decision *shall become effective 60 days after the date of its publication.*" 19 U.S.C. § 1625(c) (emphasis added). Congress could hardly have made its intention any clearer. In explicit terms, Congress established a time period that leaves no room for Customs to exercise discretion and requires Customs to provide sixty days before making the change effective. Customs attempts to reconcile the clear words of the statute with the regulations promulgated pursuant to the prior legislation. The Court does not agree that Customs can continue to use its old regulations to implement the new statute. It is clear to the Court that the current regulations conflict with the new statute and, thus, with the expressed will of Congress. Under the *Chevron* doctrine the Court's analysis of the statutory language alone could suffice. However, the Court recognizes the importance of

its interpretation of the new statutory scheme and, therefore, will proceed to a further discussion of the parties' contentions on this issue, a comparison of the relevant portions of the current regulatory scheme with the new statutory provision, and will undertake an analysis of the legislative history of the provision itself and its relevance to the goals of the Mod Act.

Customs argues that it informed the importing community that the North Star ruling was issued under 19 C.F.R. § 177, which entitles only the recipient of a ruling letter to rely on it. Furthermore, Customs explicitly mentioned in its announcements that it was proceeding according to 19 U.S.C. § 1625(c)(1). Implicit in Customs' position is that the statute contains a discretionary grant that allows Customs to proceed as it had in the absence of the statutory changes. *See e.g., Def.'s Mem. Supp. Mot. Sum. J.* at 20 ("nothing in the legislative history … indicates Congress intended 19 U.S.C. § 1625(c). to limit Customs' discretion and judgment how best to administer these laws …"). This contention by Customs is simply wrong; not only does the statutory language eliminate discretion, but a careful examination of the legislative history also demonstrates that the change to the statute was not intended to be a grant of discretion to Customs.[13]

### B. Interpretive Rulings Prior to the Mod Act

Prior to its amendment, section 625 did not address the issue of modification or revocation of interpretive rulings. Customs, as the agency charged with enforcing the statute, issued regulations to implement it. *See* 19 C.F.R. § 177. Under the regulatory scheme established by Customs, interpretive rulings were to be relied upon only by the importer requesting the ruling. 19 C.F.R § 177.9(c). If Customs desired to modify or revoke a ruling letter it could make such revocation effective immediately. 19 C.F.R.

---

**13.** Under *Chevron*, if the intent of the statute is ambiguous, the Court determines whether the agency's interpretation is a permissible construction. The Court undertakes the second step in the analysis mandated by *Chevron* despite its position that the statute is neither ambiguous nor

silent with respect to how Customs must proceed. The analysis is useful because it further illustrates a point the Court wishes to stress— Customs cannot continue to use its old regulation to implement the new statute.

§ 177.9(d)(3). However, in two circumstances Customs retained the discretion to delay the effective date—when it modified or revoked a ruling letter, or when it modified treatment previously accorded to substantially identical transactions which were not the subject of a ruling letter. Customs had the discretion to delay the effective date of the ruling for up to ninety days under either circumstance. 19 C.F.R. § 177.9(d)(3), 19 C.F.R. § 177.9(e). Customs could grant a delay to a third party when it modified or revoked a prior ruling letter if the third party could show detrimental reliance on the ruling letter. 19 C.F.R. § 177.9(d)(3). Customs could also grant a delay upon application of an affected party when a prior treatment not the subject of a ruling letter was revoked. 19 C.F.R. § 177.9(e). All of these provisions were part of the regulatory scheme set up by Customs; the statute was silent.

Current regulations remain almost identical to those in force prior to the enactment of the Mod Act.[14] Bayridge urges the Court to recognize that draft regulations published by Customs on its electronic bulletin board are more closely aligned with the current statutory scheme than the current regulations. While the draft regulations appear to track the amendments to 19 U.S.C. § 1625(c) more closely than the regulations in force at present, the Court cannot accept them as anything more than current thinking at the agency. Until the draft regulations are adopted under the Administrative Procedure Act, 5 U.S.C. § 553 (1994), they do not have the force and effect of law. However, the draft regulations may be considered by the Court as may any other persuasive source, such as a treatise or law review article, and are of particular relevance here because they provide a window into the thinking of the agency charged with interpreting the statutory scheme it administers. *See* 19 U.S.C. § 3 (1994) ("The Secretary of the Treasury shall direct the superintendence of the collection of duties on imports as he shall judge best."); *see also* 19 U.S.C. § 1624 (1994) ("In addition to the specific powers conferred by this chapter the Secretary of the Treasury is authorized to make such rules and regulations as may be necessary to carry out the provisions of this chapter").

On its electronic bulletin board, Customs posted what it titled, "Draft Regulations for Parts 174 (Protests) and 177 (Rulings) Customs Regs." [15] under the section of its bulletin board devoted to the Mod Act. *See* Customs Electronic Bulletin Board (visit-

---

14. In fact, a quick glance at 19 C.F.R. § 177 reveals that the Customs regulations implementing the statute remain in almost every respect unchanged. Indeed, the time frame in the current regulations has not been updated to reflect the amended statutory time frame. *Compare* 19 U.S.C. § 1625(a) (1994) (requiring certain decisions to be published within 90 days) *with* 19 C.F.R. § 177.10(a) (1998) (requiring certain decisions to be published within 120 days).

15. The particularly relevant draft regulations are reprinted below:

§ 177.10 Effect of [ruling letters] rulings and preclassification determinations [; modification or revocation].

\* \* \* \* \* \*

(c) *Reliance on [ruling letters] rulings by [others] third parties.*

(1) *General.* [A ruling letter is subject to modification or revocation [without notice to any person, except the person to whom the letter was addressed. Accordingly, no other]] A person [should] **may** rely on [the] a ruling [letter] **issued to or on behalf of another person,** [or] **and may** assume that the principles of [that] such a ruling will be applied, in connec-

tion with any transaction other than the one [described in] **specifically covered by** the ruling [letter], **provided that such reliance conforms to the standards set forth in paragraph (c)(2) of this section and provided that the third party exercises reasonable care.** [However] **In addition,** any person eligible to request a ruling under § 177.1[(c)]**(d)** may request **a similar ruling under this subpart or may request** information as to whether a previously-issued ruling [letter] [has been modified or revoked] **remains in effect** by writing to the [Commissioner of Customs, Attention:] Office of Regulations and Rulings, **United States Customs Service,** Washington, DC 20229, and either enclosing a copy of the ruling [letter] or furnishing other information sufficient to permit the ruling [letter] in question to be identified. **Any dispute between Customs and a third party regarding whether the third party has properly relied on a ruling issued to another person shall be dealt with administratively under the internal advice procedure provided for in subpart B of this part or under the protest procedure provided for in part 174 of this chapter.**
The draft regulation continues by striking the remainder of the current language.

ed10/29/98) <http://www.cebb.customs.treas.gov/public/cgi/cebb.exe?mode=fa & area=24>. The agency's decision to publish draft regulations, regardless of whether they have the force and effect of law, points strongly towards the conclusion that the amendment to 19 U.S.C. § 1625 by the Mod Act was viewed by Customs as working a fundamental change in the statutory framework. The legislative history also supports that view.

## C. The Customs Modernization Act

Although the Mod Act was passed as part of NAFTA, it was proposed three years earlier in two different forms: the Joint Industry Group's ("JIG") version of the bill H.R. 2512 introduced on June 3, 1991, and the Bush Administration's ("Administration") version, H.R. 2589 introduced on June 7, 1991.

The Administration's bill did not propose to amend section 625 of the Tariff Act of 1930. The JIG's version, however, read almost identical to the current language of section 625 as amended by NAFTA.[16] After working through some seventy five points of departure, the JIG's version and the Administration's were consolidated into one bill that both various industry members and Customs supported. *See Opening Market Proposals, Auto Trade, and Customs Modernization: Hearings on H.R. 5100 Before the Senate*

*Committee on Finance*, 102nd Cong. 70 (1992) (*"Hearings on H.R. 5100"*)(Statement of Aaron Cross, Public Policy Director, International Business Machines Corp., and Chairman, Joint Industry Group). Eventually, the Mod Act became part of the Trade Expansion Act of 1992, and finally appeared as Title VI of NAFTA. Appearing before the Senate Finance Committee, witnesses for Customs and the importing community touted each others' efforts. Responding to a question from Senator Moynihan asking if the proposed legislation signaled a move away from an adversarial relationship, the Chairman of the JIG responded that the "legislation implies that the historic adversarial relationship between industry and the Customs Service is not going to serve our interests, the United States' interests, as we go into the 21st century." *Hearings on H.R. 5100* at 67 (Statement of Aaron Cross); *see also Customs Modernization and Informed Compliance Act: Hearings on H.R. 3935 Before the Subcomm. on Trade of the House Comm. on Ways and Means*, 102nd Cong. 91 (1992) (*"Hearings on H.R. 3935"*) (Statement of Carol B. Hallett, Commissioner, U.S. Customs Service) ("there is now a consensus between Customs and the Joint Industry Group on more than 95% of the issues ..."); *Hearings on H.R. 5100* at 61 (Statement of Samuel H. Banks) ("After three long years of discussion and negotiation, the trade community and Customs have finally developed this

---

**16** **Section 110 of H.R.** 2512 read as follows:

Section 625 (19 U.S.C. 1625) is amended—
(1) by striking out the title "Publication of decisions" and inserting "Interpretive rulings and decisions; public information".
(2) by amending section 625 to read as follows: '(a) PUBLICATION Within 90 days after issuing any interpretative ruling or decision (including any ruling letter, internal advice memorandum, and protest review decision) under this chapter with respect to any customs transaction, the Secretary shall have such decision published in the Customs Bulletin or shall otherwise make such decision available for public inspection.
'(b) MODIFICATION AND REVOCATION A proposed interpretive ruling or decision which would modify or revoke a prior interpretative ruling or decision which had been in effect for at least 60 days, or would have the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions, shall be published in the Fed-

eral Register, and interested parties shall be given an opportunity to submit written comments on the correctness of the proposed ruling or decision. If, after consideration of the comments, the Customs Service issues the final ruling or decision, it shall become effective on the 120th day after publication in the Federal Register.
'(c) LIMITING A COURT DECISION A decision to limit the application of a court decision shall be published in accordance with the requirements of section 552 of title 5, United States Code.
'(d) PUBLIC INFORMATION The Customs Service shall publish in writing and make available through electronic media, in an efficient, comprehensive and timely fashion, all information, including directives, memoranda, electronic messages and telexes, which contains instructions, requirements, methods or advice necessary for importers and exporters to comply with the Customs laws and regulations.'.

consensus legislation concerning how we should modernize our procedures and operations."). Several statements made in hearings before the Senate Committee on Finance also suggested that the proposed changes to the Customs laws were fundamental and wide ranging. *See e.g., Hearings on H.R. 5100* at 62 (Statement of Samuel H. Banks) (explaining that one of the proposed changes would alleviate the need for a vessel's master to declare the number of cannons on board); *see also Hearings on H.R. 5100* at 66 (Statement of Aaron Cross) (stating that the legislation would "effect the broadest reforms of U.S. Customs law since 1789."). When the Mod Act passed it was reported that "over 50 percent of [Customs] regulations ... [would] need to be revised to implement Title VI [the Mod Act provisions]. The regulatory changes that will be required include those with respect to: ... rulings procedures and publication of rulings...." Statement of Administrative Action, NAFTA Implementation Act, H.R. Doc. No. 103–159, at 680E (1993). On this point, Commissioner Carol Hallett made it clear that Customs supported the JIG concept of informed compliance and it understood that term to require "changes and *new* procedures relating to Customs protest procedures; publication of interpretive rulings; appeals of adverse interpretive rulings; and modification and revocation of prior interpretive rulings." *Hearings on H.R. 3935* at 97 (Statement of Carol B. Hallett) (emphasis added). It is clear to the Court from both the change to the statute and the goals of the industry and Customs that the Mod Act was meant to alter fundamentally the entire statutory regime.

### D. Section 625 as amended

According to Customs, section 625(c) should be read as a grant of discretion when it proposes an interpretive ruling or decision. Bayridge, however, contends that paragraphs 1 and 2 of section 625(c) are to be read as "restrictions on Customs' authority to issue interpretive rulings. These restrictions are triggered by the 'effect' of Customs' actions—not by Customs' intent." *Pl.'s Mem.* at 25. Although the Court finds the statutory language itself to be neither ambiguous

nor silent as to a grant of discretion, the failure to carry over the discretionary language of the old regulations into the new statute provides further support for the conclusion that Congress did not intend the statute to be a discretionary grant to Customs. Therefore, Customs' interpretation would not be entitled to deference under a complete *Chevron* analysis if one were necessary.

Modification and revocation of ruling letters were discussed in the old regulations but were not present in 19 U.S.C. § 1625 prior to its amendment by the Mod Act. The modification or revocation of a ruling letter was dealt with under 19 C.F.R. § 177.9(d) and the issuance of a ruling letter that would have the effect of modifying treatment previously accorded by Customs to substantially identical transactions appeared in 19 C.F.R. § 177.9(e). The Court thinks it no small coincidence that nearly identical language has moved from the Code of Federal Regulations to the United States Code, appearing as 19 U.S.C. § 1625(c), but absent discretionary language.

[14] The fundamental underlying difference between Bayridge's interpretation of the statute and Customs' is the purpose of the change, *i.e.*, was it intended to grant or deny discretion to Customs. When Congress enacts a law it is presumed to know the existing law. *See Bristol–Myers Squibb Co. v. Royce Laboratories, Inc.*, 69 F.3d 1130, 1136 (Fed.Cir.1995); *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1572 (Fed.Cir.1994); *VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1581 (Fed.Cir.1990); *United States v. Douglas Aircraft Co.*, 62 C.C.P.A. 53, 510 F.2d 1387, 1391–92 (1975) (stating Congress is presumed to know of the existence of regulations). Here, Congress legislated in an area with regulations granting the agency significant discretion concerning whether to apply a delay and to whom it could be applied. Rather than codifying the existing administrative practice, Congress enacted a statute that omitted all discretionary references. Customs regulations implementing the old statute, and which remain in force, provided:

Any ruling letter found to be in error or not in accordance with the current views of the Customs Service may be modified or revoked. Modification or revocation of a ruling letter shall be effected by Customs Headquarters by giving notice to the person to whom the ruling letter was addressed and, where circumstances warrant, by publication of a notice or other statement in the Customs Bulletin. 19 C.F.R. § 177.9(d)(1) (1998).

The amended language of the statute removes the discretion to publish found in the regulation and reads:

A proposed interpretive ruling or decision which would-

(1) modify (other than to correct a clerical error) or revoke a prior interpretive ruling or decision which has been in effect for at least 60 days ... *shall* be published in the Customs Bulletin.

19 U.S.C. § 1625(c)(1) (1994) (emphasis added).

With respect to the effective dates of the changed treatment, the regulations say:

a ruling letter modifying or revoking an earlier ruling letter will be effective on the date it is issued. However, the Customs Service may, upon application or on its own initiative, delay the effective date of such a ruling for a period of up to 90 days from the date of issuance. Such a delay may be granted with respect to the party to whom the ruling letter was issued or to any other party, provided such party can demonstrate to the satisfaction of the Customs Service that they reasonably relied on the earlier ruling to their detriment. All parties applying for a delay will be issued a separate ruling letter setting forth the period, if any, of the delay to be provided. In appropriate circumstances, the Customs Service may decide to make its decision, with respect to a delay, applicable to all affected parties, irrespective of demonstrated reliance; in this event, a notice announcing the delay will be published in the Customs Bulletin and individual ruling letters will not be issued. 19 C.F.R. § 177.9(d)(3) (1998).

As previously discussed in this opinion, the statute reads instead, "[t]he final ruling or decision *shall* become effective 60 days after the date of its publication." 19 U.S.C. § 1625 (emphasis added). With the amended statute and the regulation thus juxtaposed, it is clear that Congress did not intend to grant Customs discretion, but rather, to remove it.

Likewise, section 625(c)(2) was extant as a regulation when the Mod Act passed. The regulation provided:

(e) Ruling letters modifying past Customs treatment of transactions not covered by ruling letters—(1) General. The Customs Service will from time to time issue a ruling letter covering a transaction or issue not previously the subject of a ruling letter and which *has the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions* of either the recipient of the ruling letter or other parties. Although such a ruling letter will generally be effective on the date it is issued, the Customs Service may, upon application by an affected party, delay the effective date of the ruling letter, and continue the treatment previously accorded the substantially identical transaction, for a period of up to 90 days

from the date the ruling letter is issued.

19 C.F.R. § 177.9(e) (1993) (emphasis added). *See also* 19 C.F.R. § 177.9(e) (1998) (same).

The current statutory provision provides that any proposed interpretive ruling or decision which would "have the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions; shall be published in the Customs Bulletin." 19 U.S.C. § 1625(c)(2) (1994). Time periods governing publication, notice and comment and the effective date are the same as those for rulings falling under 19 U.S.C. § 1625(c)(1). Again, when Congress enacted 19 U.S.C. § 1625(c)(2) it omitted the discretionary language of the regulation, and chose mandatory language.

It would be absurd to find that Customs could continue to operate under its old regulations implementing the statute without accounting for the significant change made to the statute. The Court, today, does not dis-

pute the agency's authority to interpret its statute through the promulgation of regulations. But in this case, the agency has not implemented regulations to account for a significant change. Not only does the statute plainly dictate the outcome, but deference cannot be paid to the agency's interpretation of 19 U.S.C. § 1625, as amended, because the agency has simply not interpreted the new statute. In fact, the only apparent attempt to interpret the amended statute by the agency, the "draft regulations," is a recognition of the significant change the amendment was meant to have. Here, the agency's continued reliance on regulations that have been superseded by the amendment to the statute could not be found to be reasonable even if the statute were silent or ambiguous.

*E. The Sixty Day Delay Is Applicable to All Parties Under 19 U.S.C. § 1625(c)(1)*

On its face, 19 U.S.C. § 1625(c)(1) requires a proposed interpretive ruling or decision modifying or revoking a prior interpretive ruling or decision to be published, and for a sixty day delay to be given before the final ruling becomes effective. Nothing in the statute states that only the recipient of a ruling letter receives a sixty day delay under 19 U.S.C. § 1625(c)(1). On February 18, 1997, Customs, following a request from North Star Wholesale Lumber, issued an unpublished ruling, the North Star Ruling, stating that North Star's imports of predrilled studs would be classified under 4418.90, HTSUS. Customs stated in a Federal Register notice that no importer was entitled to rely on the North Star ruling and that claims for detrimental reliance would not be entertained. 62 Fed.Reg. 55667, 55668 (Oct. 27, 1997). On April 15, 1998, Customs published notice in the Customs Bulletin that it intended to revoke the North Star Ruling. Customs published its final determination on July, 1, 1998 ("HQ 961555"). On July 9, 1998, Bayridge attempted to enter substantially identical merchandise to that covered by HQ 96155. *See National Lumber and Bldg. Material Dealers Assoc. v. United States,* No. 98–06–02426 (CIT June 30, 1998) (Stipulated Procedures: Dismissal at ¶ 3). Following liquidation of the attempted entry on July 17, 1998, Bay-

ridge protested both the classification of the merchandise under 44.07, HTSUS, and Customs' failure to provide a sixty day delay before implementation of HQ 961555.

Customs acted contrary to 19 U.S.C. § 1625(c) when it stated that claims for detrimental reliance would not be entertained and that third parties were not entitled to rely on the North Star Ruling. As discussed, publication and the date any change goes into effect are mandatory commands to Customs. The statute is clear that a proposed interpretive ruling or decision which would modify or revoke a prior interpretive decision in effect for sixty days shall be published. 19 U.S.C. § 1625(c) The statute continues, saying that the "final ruling or decision shall become effective 60 days after the date of its publication." 19 U.S.C. § 1625(c). Customs did not follow the statutory mandate because it made the ruling effective immediately with respect to all importers except North Star. For the reasons herein discussed, the Court holds that under the amended statute, when Customs modifies or revokes a prior interpretive ruling or decision, in addition to fulfilling the other statutory requirements concerning publication and notice and comment periods, the final ruling or decision does not become effective with respect to any party until sixty days after the date of its publication.

Therefore, in this case, Bayridge and all importers of predrilled studs, not just North Star Wholesale Lumber should have been afforded sixty days from July 1, 1998, within which to enter their merchandise under HTSUS heading 44.18.

## IV. CONCLUSION

Therefore, the Court rules that U.S. Customs correctly classified the imported merchandise under HTSUS subheading 4407.10.0015.

The Court further rules that Customs incorrectly interpreted 19 U.S.C. § 1625(c) in its Federal Register notices announcing reconsideration of the N.Y. Ruling B81564, dated February 18, 1997, when it stated that third parties were not entitled to rely upon that ruling for future importations of predrilled studs. The statute clearly requires a

sixty day delay from publication for a modification or revocation of an existing ruling to become effective. Accordingly, it is hereby

ORDERED that the Plaintiff and Defendant shall confer and submit a proposed final judgment, within ten days of receiving notice of the entry of this opinion; and it is further

ORDERED that if the Plaintiff and Defendant cannot agree each shall submit a proposed final judgment, within ten days certifying that an attempt to confer was made. A separate order granting final judgment will follow.